Filed 8/13/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| EDEN GONZALEZ HASS et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>RHODYCO PRODUCTIONS,<br><br>      Defendant and Appellant. | A142418<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-12-520492) |

After crossing the finish line at the 2011 Kaiser Permanente San Francisco Half Marathon, Peter Hass (Hass) tragically suffered a cardiac arrest, collapsed, and died. Hass's wife, Eden Hass, and his two minor children (collectively, the Hass Family) consequently filed this wrongful death action, alleging that numerous race-affiliated individuals and entities—including event organizer David Rhody, individually and dba RhodyCo Productions (RhodyCo)—were negligent in the organization and management of the race, particularly with respect to the provision of emergency medical services.[1] The trial court initially granted RhodyCo's summary judgment motion in this matter, concluding that the instant action was barred under theories of primary assumption of the risk and express waiver. However, after the Hass Family filed a motion for new trial, the trial court reversed itself. Specifically, the court found that primary assumption of the risk was inapplicable on these facts and further determined that the Hass Family should have been allowed to amend their complaint to plead gross negligence, conduct falling

---

[1] RhodyCo is the appellant herein and the only remaining defendant, as a number of settlements have occurred and all of the other named defendants have been dismissed from the action.

1

outside of the scope of the written waiver and release. On appeal, RhodyCo argues that the trial court's initial grant of summary judgment was correct, even if the issue of gross negligence is considered on its merits. The Hass Family, in contrast, generally champions the court's new trial order, but argues that the express release in this case was invalid on additional grounds rejected by the trial court and that the court should have concluded on the evidence before it that a triable issue of material fact exists as to RhodyCo's gross negligence. We agree with the trial court that summary judgment was not warranted in this case based on primary assumption of the risk. However, we believe the trial court erred in requiring amendment of the complaint to plead gross negligence and determine, based on our independent review of the record before us, that a triable issue of material fact exists on this issue. We therefore affirm in part and reverse in part, with instructions to enter a denial of RhodyCo's summary judgment motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The annual Kaiser Permanente San Francisco Half Marathon & 5K Run in Golden Gate Park (Half Marathon) consists of two different events—a 13.1 mile half marathon and a 5 kilometer run. In 2011, the anticipated attendance for the two races was estimated to include 10,000 participants and 600 volunteers. RhodyCo provided event management and production services for the Half Marathon from 2006 through 2011. In order to obtain the necessary temporary street closure permit for the event, RhodyCo was required to submit an emergency medical services plan (EMS Plan) to the City and County of San Francisco (City) for review and approval by the City's Emergency Medical Services Agency (Agency).

The approved EMS Plan for 2011 stated, as it had in previous years, that the medical personnel at the Half Marathon would be provided by Palmer College of Chiropractic-West (PCCW) and American Medical Response (AMR). More specifically, it asserted that PCCW would " 'provide event trained Medical Personnel for the event, (students are all CPR certified and have taken emergency response class). Med Teams will be located at key areas (Start Line, Finish Lines, Postrace Medical Tent, and mobile units on the course). The head clinician event day, Dr. Hal Rosenberg [phone number],

2

will be onsite at the Postrace Medical Tent. AMR will provide an [emergency medical technician (EMT)] who will be posted with PCCW Med Team in the postrace Medical Tent at the Finish of the race—AMR is also providing an ALS ambulance to respond [to] medical emergencies—the standby will be posted on Lincoln at the Great Hwy . . . . The Standby and Medical Team will be equipped with cellphone active Nextel radios with direct communication to the Event Coordinator and each other.' " Other portions of the approved EMS Plan, however, indicated that one M.D., 6+ EMTs, and one automatic external defibrillator (AED) would be located at the finish line.

Having signed a release (Release) in which he agreed, among other things, to "accept the inherent dangers and risks" arising from his participation in the race and to release RhodyCo from "any and all claims" based on injuries he might suffer "at or enroute to and from this event," Hass participated in the Half Marathon on February 6, 2011. Almost immediately after crossing the finish line at 10:05:34 a.m., Hass suffered a sudden cardiac arrest and collapsed. Another runner, Dr. Charles Whitehill, crossed the finish line 13 seconds after Hass and heard him fall. Dr. Whitehill—who had significant experience in providing and overseeing resuscitation efforts for patients—began to perform cardiopulmonary resuscitation (CPR) on Hass within 30-60 seconds of arriving at Hass's side. Dr. Whitehall was involved in CPR efforts for five to eight minutes, after which CPR was continued by another bystander who identified himself as an off-duty paramedic. Approximately 11 minutes after Hass collapsed a third bystander brought the AED from the post-race tent, which was located somewhere between 100 and 200 yards beyond the finish line. When the AED was applied, it showed that Hass had no shockable heart rhythm. CPR efforts were then continued until paramedics from the City's Fire Department arrived at approximately 10:31 a.m. and took over treatment. Unfortunately, Hass was pronounced dead shortly thereafter at 10:49 a.m. RhodyCo has provided event management and production services for over 25 years, including at least 400 running, walking, and other events involving over 1.5 million participants. Hass's tragic death was the only fatality ever experienced at a RhodyCo-managed event.

On May 3, 2012, the Hass Family filed this wrongful death action (Complaint), alleging, among other things, that RhodyCo had negligently organized and planned the Half-Marathon; negligently "hired, retained, . . . supervised, [and] controlled" the medical team; and negligently "managed, trained, supervised and controlled emergency and medical resources." In particular, the Hass Family highlighted the use of chiropractors rather than medical doctors, the use of chiropractic students rather than EMTs, the lack of ambulance personnel at the finish line, inadequate communication and communication devices, and inadequate AEDs and ambulances. RhodyCo answered, generally denying the Complaint allegations and asserting several affirmative defenses, including primary assumption of the risk and express contractual assumption of the risk and release of liability.

RhodyCo then filed a motion for summary judgment, arguing that the Hass Family's wrongful death action was completely barred based on the two aforementioned affirmative defenses. Specifically, RhodyCo claimed that Hass had agreed to be bound by the Release when he registered for the Half Marathon, which included a waiver of liability and assumption of the risk agreement that was binding on his heirs. In addition, RhodyCo asserted that sudden cardiac arrest is an inherent risk of long-distance running and that it had done nothing to increase this risk. Under these circumstances, RhodyCo opined, the Hass Family's action was barred under the primary assumption of the risk doctrine.

In opposition to the summary judgment motion, the Hass Family argued with respect to the Release that it was void to the extent it purported to cover emergency medical services, as such services implicate the public interest; that it was not a clear and unambiguous waiver of future liability for a wrongful death claim; and that it was ineffective to exempt RhodyCo from liability for gross negligence. With respect to the doctrine of primary assumption of the risk, the Hass Family agreed that cardiac arrest is an inherent risk of long-distance running, but argued that a sponsoring entity is nevertheless obligated to take reasonable steps to minimize inherent risks to the extent it is able to do so without altering the nature of the sport. They further maintained that

4

RhodyCo had increased the risk of death beyond that inherent in the sport by failing to comply with the EMS Plan.

On the issue of negligence, the Hass Family presented evidence indicating that medical emergencies (including cardiac arrests) are more likely to occur near the finish line of a race because runners tend to push themselves to improve their times, causing an adrenaline rush and an arrhythmia. Moreover, as the City, itself, has recognized: " '[C]losing off several major streets at the same time to accommodate a race often causes . . . potential interference with emergency services.' " (San Francisco Transportation Code, § 6.11, subd. (a).) The Hass Family argued that, although RhodyCo's EMS Plan for the Half Marathon properly identified the finish line as a " 'key area' " and indicated numerous resources would be stationed there—including a medical doctor, AED, and "6+" EMTs—the only medical personnel assigned to the finish line were Dr. Rosenberg (a chiropractor) and the Event Coordinator (a chiropractic student), neither of whom were actually at the finish line when Hass collapsed. They further claimed that the AED was in the medical tent located approximately 200 yards away, in the post-race expo area; that no event medical personnel arrived at the scene until ten minutes after Hass collapsed; and that, when a bystander arrived with the AED at the 11-minute mark, it was too late to help Hass. The Hass Family also found fault with the communications equipment provided by RhodyCo for the Half Marathon. Although the EMS Plan represented that "all event safety personnel" would have "cell phone active radios," the Hass Family averred that only six or seven radios were provided to the medical team; that no radio was provided to the ambulance or to either chiropractic doctor on site; and that there was no radio in the medical tent. Finally, the Hass Family presented declarations from several experts indicating that the standard of care for an event like the Half Marathon is to have a competent medical director who is a medical doctor and to follow the medical plan. Moreover, according to one of the Hass Family's experts, because races like the Half Marathon can disrupt the local 911 system, the standard of care additionally requires enough on-site ambulances (and/or backfilling of

5

ambulances) to provide for rapid medical care for runners who collapse due to sudden cardiac arrest, particularly near the finish line.[2]

As stated above, the trial court initially granted RhodyCo's summary judgment motion, concluding that the Hass Family's wrongful death action was barred under theories of primary assumption of the risk and express waiver. The Hass Family then filed a motion for new trial, arguing that the trial court had erred in its legal analysis of the primary assumption of the risk doctrine. In addition, they asserted that all of the trial court's conclusions with respect to the Release were erroneous. In particular, they argued that they were not required to plead gross negligence in the Complaint and that, in any event, it was an abuse of discretion to deny their request to amend the Complaint to cure any such perceived defect. The Hass Family also provided new evidence that they alleged supported finding a triable issue with respect to gross negligence—the deposition testimony of Dr. Brown, the head of the Agency, stating that nothing in the EMS Plan

---

[2] RhodyCo objected to these expert declarations on a number of grounds in the trial court, but, given its resolution of the summary judgment and new trial motions before it, the court never needed to rule on their admissibility. RhodyCo now argues that we should not consider them on appeal for similar reasons. We are cognizant of the fact that "[i]t will always be possible for a plaintiff who suffers a sports injury to obtain expert testimony that the injury would not have occurred if the recreation provider had done something differently." (*American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, 39.) Moreover, generally speaking, courts do not consider an expert's testimony to the extent it constitutes a conclusion of law. (*Summers v. A.L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1180-1181.) However, we do not believe that the expert declarations in the present case were limited to offering legal conclusions. Rather, they present useful information regarding the standard of care for races such as the Half Marathon from individuals who appear eminently qualified to provide it. (See *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003-1017 (*Kahn*) [" 'we perceive no reason to preclude a trial court from receiving expert testimony on the customary practices in an arena of esoteric activity for purposes of weighing whether the inherent risks of the activity were increased by the defendant's conduct' "]; see also Evid. Code, § 805 [an expert's testimony may embrace an ultimate factual issue].) We therefore consider them for that purpose. (Cf. *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1086-1087 (*Rosencrans*) [relying on an expert declaration on the issue of extreme departure from the ordinary standard of care when finding a triable issue with respect to gross negligence].)

indicated that chiropractic students would be substituted for EMTs at the finish line and that his discussions with RhodyCo regarding the use of chiropractic students was limited to their use on the mobile teams. Dr. Brown also testified that he had never discussed with RhodyCo the propriety of substituting a chiropractic doctor for a medical doctor as race supervisor. RhodyCo opposed the motion for new trial, arguing that the trial court's initial decision was correct under the law; that Dr. Brown's deposition testimony should not be considered as the Hass Family had not acted with diligence in producing it; and that, regardless, the statements from the deposition highlighted by the Hass Family were undercut by other deposition testimony.

After hearing, the trial court granted the Hass Family's new trial motion. Specifically, the court agreed with the Hass Family that primary assumption of the risk was inapplicable on these facts and further determined that the Hass Family should have been allowed to amend the Complaint to plead gross negligence. Although it refused to rule on the existence of a triable issue with respect to gross negligence pending the filing of the amended Complaint, it did reject RhodyCo's argument that the Hass Family had not moved with diligence in taking the deposition of Dr. Brown.

RhodyCo's notice of appeal and the Hass Family's notice of cross-appeal now bring the matter before this court.

## II. DISCUSSION

### A. *Standard of Review*

As described above, the procedural posture of this case is somewhat convoluted. Although the trial court initially granted RhodyCo's summary judgment motion, it subsequently reversed itself on one ground (primary assumption of the risk) and then deferred ruling on another ground it had previously rejected (gross negligence) pending amendment of the Complaint, effectively granting a new trial on both issues. Such an order is appealable. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 858 (*Aguilar*) [noting, in finding appealability under similar circumstances, that it "makes no difference" that an order granting a new trial following an order granting summary judgment "may operate like an order denying summary judgment, which is

7

nonappealable"].)  Further, although orders granting a new trial are generally examined for abuse of discretion, any determination underlying the new trial order is scrutinized using "the test appropriate for that determination." (*Douglas v. Fidelity National Ins. Co.* (2014) 229 Cal.App.4th 392, 407; see also *Aguilar*, *supra*, 25 Cal.4th at pp. 859-860.)

Here, then, the trial court's conclusions with respect to the appropriateness of summary judgment are subject to our de novo review.  (*Aguilar*, *supra*, 25 Cal.4th at p. 860; *In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 150 (*Automobile Antitrust Cases*).)  In this regard, we review the trial court's ruling; not its rationale.  (*Automobile Antitrust Cases*, *supra*, 1 Cal.App.5th at p. 150.)  "Thus, '[t]he sole question properly before us on review of the summary judgment [order] is whether the judge reached the right *result* . . . whatever path he [or she] might have taken to get there.' " (*Id.* at pp. 150-151.)

Moreover, the underlying issues implicated by RhodyCo's summary judgment motion are also subject to our independent review.  For instance, " '[c]ontract principles apply when interpreting a release, and "normally the meaning of contract language, including a release, is a legal question." [Citation.]  "Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, 'construction of the instrument is a question of law, and the appellate court will independently construe the writing.' " ' " (*Cohen v. Five Brooks Stable* (2008) 159 Cal.App.4th 1476, 1483 (*Cohen*); see also *Paralift, Inc. v. Superior Court* (1993) 23 Cal.App.4th 748, 754-755 (*Paralift*).)  Similarly, it has long been recognized that application of the primary assumption of the risk doctrine is a legal question, to be determined by the courts as a matter of law.  (See *Kahn, supra*, 31 Cal.4th at pp. 1003-1004; see also *Honeycutt v. Meridian Sports Club, LLC* (2014) 231 Cal.App.4th 251, 257 [" '[T]he legal question of duty, and specifically the question of whether a particular risk is an inherent part of a sport, "is necessarily reached from the common knowledge of judges, and not the opinions of experts" ' "].)  In our resolution of this matter, then, we are writing on what is essentially a clean slate, bearing in mind that we should resolve any evidentiary doubts in the Hass Family's favor, given that they are the party opposing summary judgment.

8

(*Automobile Antitrust Cases*, *supra*, 1 Cal.App.5th at p. 151 ["In undertaking our analysis, we ' "accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them." ' "].)

**B.      *Express Waiver***

During the online registration process for the Half Marathon, Hass was presented with the following warning regarding his need to execute the Release:  "**Please read any waiver carefully.**  It includes a release of liability and waiver of legal rights and deprives you of the ability to sue certain parties.  Do not agree to this document unless you have read and understood it in its entirety.  By agreeing electronically, you acknowledge that you have both read and understood all text presented to you as part of the registration process. *You also understand and agree that events carry certain inherent dangers and risks which may not be readily foreseeable, including without limitation personal injury, property damage, or death*.  Your ability to participate in the event(s) is/are subject to your agreement to the waiver and by agreeing herein, you accept and agree to the terms of the waiver and release agreement."  (Italics added.)  The document referenced in this warning—which could either be printed out or read in its entirety online—is entitled "**Waivers**" and reads in pertinent part as follows:  "I understand that by registering I have accepted and agreed to the waiver and release agreement(s) presented to me during registration and that these documents include a release of liability and waiver of legal rights and deprive me of the right to sue certain parties. *By agreeing electronically, I have acknowledged that I have both read and understood any waiver and release* agreement(s) presented to me as part of the registration process *and accept the inherent dangers and risks which may or may not be readily foreseeable, including without limitation personal injury, property damage or death that arise from participation in the event*.  [¶]  In consideration of your accepting this entry . . . *, I, intending to be legally bound, do hereby for myself, my heirs, executors, and/or administrators, waive and release any and all claims for damages* I may accrue against . . . RhodyCo . . . any and all contractors, their employees, representatives, agents and heirs *from any and all injuries that may be suffered by me at or enroute to or from this event*.  I attest that I am

9

physically fit and sufficiently trained for this strenuous competition. I will assume my own medical and emergency expenses in the event of an accident or other incapacity or injury resulting from or occurring in my participation. . . ." (Italics added.)[3]

As stated above, RhodyCo argued in its summary judgment motion that the Release signed by Hass (Release) acted as a complete bar to the instant action. The trial court initially agreed, rejecting the Hass Family's arguments that the wording of the Release was insufficient to exempt RhodyCo from wrongful death claims and that the Release was void on public policy grounds. In addition, because gross negligence was not specifically alleged in the Complaint, the court refused to consider the Hass Family's third argument—that RhodyCo had engaged in gross negligence falling outside of the scope of the Release. However, the trial court later granted a new trial on this issue, stating it would allow the Hass Family to amend its Complaint to cure this defect. The court declined to determine whether a triable issue as to RhodyCo's alleged gross negligence existed, pending the filing of the amendment. In this appeal and cross appeal, the parties raise all three of these issues involving the impact of the executed Release as potential grounds either supporting or undermining the trial court's summary judgment decision. We therefore address each contention in turn.

1. *Waiver of Wrongful Death Claim*

Our high court has explained that wrongful death claims "are not derivative claims but are independent actions accruing to a decedent's heirs." (*Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 841 (*Ruiz*); see also *Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 596 (*Madison*) [" 'The longstanding rule is that a wrongful death action is a separate and distinct right belonging to the heirs, and it does not arise until the death of the decedent.' "]**.**) "Because a wrongful death claim is not derivative of the decedent's

---

[3] The Release was immediately followed by another, extensive waiver and release agreement entitled "Active Registration Agreement and Liability Waiver," designed to absolve The Active Network, Inc. (Active) from certain liabilities in connection with its role as the registration portal for the event. We agree with the Hass Family that the contents of this separate waiver and release agreement—directed solely to Active—has no relevance to our construction of the RhodyCo Release.

claims, an agreement by the decedent to release or waive liability for [his or] her death does not necessarily bar a subsequent wrongful death cause of action." (*Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 725.) Rather, a distinction is made in these circumstances "between the legal *ineffectiveness* of a decedent's preinjury release of his [or her] heirs'[] subsequent wrongful death action and the legal *effectiveness* of an express release of negligence by a decedent which provides a defendant with 'a complete defense.' " (*Madison*, *supra*, 203 Cal.App.3d at p. 597.) In other words, although a decedent cannot release or waive a subsequent wrongful death claim by the decedent's heirs, that decedent's "express agreement to waive the defendant's negligence and assume all risks" acts as a complete defense to such a wrongful death action. (*Saenz v. Whitewater Voyages, Inc.* (1990) 226 Cal.App.3d 758, 763-764 (*Saenz*); see also *Ruiz*, *supra*, 50 Cal.4th at pp. 851-852 ["although an individual involved in a dangerous activity cannot by signing a release extinguish his [or her] heirs' wrongful death claim, the heirs will be bound by the decedent's agreement to waive a defendant's negligence and assume all risk"].) Under such circumstances, the releasor is essentially agreeing not to expect the other party to act carefully, thus eliminating that person's duty of care. (*Coates v. Newhall Land & Farming, Inc.* (1987) 191 Cal.App.3d 1, 7 (*Coates*).)

As an example, in *Coates*, *supra*, 191 Cal.App.3d 1, the decedent, a dirtbike rider, signed a release before using the defendant's motorcycle park. (*Id.* at pp. 3-4.) After the decedent was fatally injured, his heirs sued, arguing that the defendant had been negligent in the design and maintenance of the trail on which the decedent was hurt. (*Ibid.*) The appellate court agreed with the trial court that the decedent's release barred the subsequent wrongful death action. Specifically, the court noted that, in the first half of the release, the decedent "expressly *waived liability* for injuries or death which might result from respondents' ordinary negligence in the future. In the second half, he expressly *assumed all risk of injury* from dangers inherent in dirtbike riding on respondents' premises." (*Id.* at p. 7; see also *id*. at p. 4 & fn. 2.) The court concluded that this express assumption of the risk also bound the decedent's heirs. (*Id*. at p. 8.) The court additionally opined that whether or not the decedent had "sufficient knowledge of

11

the *particular risk* which resulted in his death" was irrelevant under the circumstances of the case because "knowledge of a particular risk is unnecessary when there is an express agreement to assume all risk." (*Id.* at pp. 8-9.)

Our own decision in *Saenz*, *supra*, 226 Cal.App.3d 758, is in accord. There, the decedent fell out of a raft on a whitewater rafting trip hosted by Whitewater, a commercial rafting company, and drowned. (*Id.* at pp. 759, 762.) Prior to this fatal incident, the decedent had signed a release, stating: " 'I am aware that certain risks and dangers may occur on any river trip with Whitewater . . . . These risks include, but are not limited to, hazards of and injury to person and property while traveling in rafts on the river, accident or illness in remote places without medical facilities, the forces of nature . . . . [¶] . . . I hereby *assume all of the above risks* and, except in the case of gross negligence, *will hold Whitewater . . . harmless from any and all liability*, actions, causes of action, debts, claims, and demands *of every kind and nature whatsoever* which I now have or which may arise out of or in connection with my trip or participation in any activities with Whitewater . . . .' The agreement further stated it operated as a release and assumption of risk for his heirs." (*Id.* at p. 763, fn. 7, italics added.) Noting that "drafting a legally valid release is no easy task," we opined that " '[t]o be effective, a release need not achieve perfection . . . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence.' " (*Id.* at p. 765.) Given that the plain language of the *Saenz* release indicated that the decedent consented to assume the risks associated with whitewater rafting and release Whitewater from any and all liability arising out of the trip, the fact that the exculpatory sentence did not explicitly state that it covered Whitewater's negligence and did not specifically mention death or drowning was insufficient to invalidate the otherwise clear release. (*Id.* at pp. 765-766; see also *Cohen*, *supra*, 159 Cal.App.4th at p. 1485 [" 'If a release of *all* liability is given, the release applies to any negligence of the defendant.' " (Italics added.)].)

Indeed, generally speaking, " '[w]hether a release bars recovery against a negligent party "turns primarily on contractual interpretation, and it is the intent of the

parties as expressed in the agreement that should control." ' " (*Sanchez v. Bally's Total Fitness Corp.* (1998) 68 Cal.App.4th 62, 66-67.)  Moreover, in this regard, " '[o]ur analysis is not based on the mechanical application of some formula.  The presence or absence of the words "negligence" or "bodily injury" is not dispositive.  We look instead to the intention of the parties as it appears in the release forms before the court.' " (*Id.* at p. 67; see also *Cohen*, *supra*, 159 Cal.App.4th at p. 1488 [noting that release should be understood as speaking to an ordinary person untrained in the law].)  By signing the Release in the instant case, we conclude that Hass intended both to assume all risks associated with his participation in the race, up to and including the risk of death, and to release RhodyCo (on behalf of himself and his heirs) from any and all liability with respect to any injuries he might suffer as a result of his participation.  This was sufficient to block the Hass Family's wrongful death claim for ordinary negligence.

The Hass Family, however, argues that the Release executed by Hass in this case is ineffective as a defense to their wrongful death claim because the express assumption of the risk language is limited solely to risks "inherent" in race participation—I "accept the inherent dangers and risks . . . that arise from participation in the event"—which does not include any potentially negligent conduct by RhodyCo that may have increased those inherent risks.  They further contend that the release language contained in the next sentence of the Release is similarly ineffectual in the wrongful death context because it is limited to "any and all claims for damages *I* [i.e., Hass] may accrue," thus excluding claims accrued by his heirs.  We are not persuaded.

"With respect to the question of express waiver, the legal issue is *not* whether the particular risk of injury appellant suffered is inherent in the recreational activity to which the Release applies [citations], but simply *the scope of the Release*." (*Cohen*, *supra*, 159 Cal.App.4th at p. 1484.)  Here, reading the Release as a whole—as would an ordinary person untrained in the law—we are convinced it expresses Hass's intent to assume all risks arising from his participation in the Half Marathon, including any risks related to RhodyCo's negligence.  In particular, and as we remarked in *Saenz* (also a wrongful death action), we believe that the juxtaposition of the assumption of risk language and the

13

blanket release language conveys the message that Hass assumed all risks related to participation in the Half Marathon while excusing RhodyCo from any liability arising from the race. (See *Paralift*, *supra*, 23 Cal.App.4th at pp. 756-757 [considering broad release language as well as assumption language in upholding release in wrongful death action]; *Saenz*, *supra*, 226 Cal.App.3d at p. 765 [same]; *Coates*, *supra*, 191 Cal.App.3d at p. 7, 9 & fn. 2 [release valid where decedent waived all liability for injury or death and assumed risk of injury from dangers inherent in riding dirt bike on premises]; see also *National & Internat. Brotherhood of Street Racers, Inc. v. Superior Court* (1989) 215 Cal.App.3d 934, 937-938, 940 (*Street Racers*) [in case claiming lack of competent medical attention/rescue equipment, release is valid even though it included an assumption of " 'all risk inherent in racing' " because it also released "in unqualified terms . . . all claims arising from plaintiff's participation in the race"].)[4]

We similarly reject the Hass Family's assertion that the assumption of risk language used in the Release—I "accept the inherent dangers and risks . . . that arise from participation in the event"—is ambiguous as "accept" in this context could reasonably mean "understand" as well as "assume." (See *Cohen*, *supra*, 159 Cal.App.4th at p. 1485 [an ambiguity in a release exists when a party can identify an alternative, semantically reasonable, candidate of meaning; an ambiguity " 'should normally be construed against the drafter' " of the release].) The complete sentence at issue reads: "By agreeing electronically, I have acknowledged that I have *both* read and *understand* any waiver and release agreement(s) presented to me as part of the registration process and *accept* the inherent dangers and risks which may or may not be readily foreseeable, including

---

[4] *Cohen,* 159 Cal.App.4th 1476, relied upon by the Hass Family, is not to the contrary. In that case, the injured plaintiff agreed " 'to assume responsibility for the risks *identified herein* and *those risks not specifically identified*." (*Id.* at p. 1486.) All of the identified risks involved the unpredictability of horses. (*Id*. at pp. 1485-1486.) The court found the language in the release ambiguous as to whether the " 'risks not specifically identified' " involved all possible risks (including negligent conduct on the part of the trail guide) or only non-specified risks involving the horses. (*Ibid.*) In doing so, the appellate court expressly distinguished those cases, like this one, involving broad releases covering *any and all* injuries arising out of the recreational activity at issue. (*Id.* at pp. 1489-1490.)

14

without limitation personal injury, property damage or death that arise from participation in the event." (Italics added.) Since the signator, in the first part of the sentence, has already acknowledged understanding the contents of the waiver—which includes the statement that there are risks inherent in participating—it seems unlikely that he or she would be asked to acknowledge such an understanding a second time in the latter part of the sentence. Rather, the much more reasonable interpretation of this second clause is that the signator is agreeing to shoulder—i.e., take on or otherwise assume—the dangers and risks inherent in the activity.

Finally, in construing the instant Release, we are cognizant of the fact that "[i]n cases arising from hazardous recreational pursuits, to permit released claims to be brought to trial defeats the purpose for which releases are requested and given, regardless of which party ultimately wins the verdict. Defense costs are devastating. Unless courts are willing to dismiss such actions without trial, many popular and lawful recreational activities are destined for extinction." (*Street Racers*, *supra*, 215 Cal.App.3d at p. 938.) While certainly imperfect, we believe that the instant Release was intended to be, and was accepted as, a comprehensive assumption of all risks associated with race participation. We therefore agree with the trial court that the Release constitutes a complete defense to a wrongful death action based on ordinary negligence.

2. *Public Policy*

The Hass Family, however, argues that, even if the Release might otherwise be deemed a valid bar to their negligence claim, it is void as against public policy to the extent it purports to apply to the provision of emergency medical services, as such services implicate the public interest. Civil Code section 1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." A contractual provision exculpating a party from liability is invalid under this statute if it "affects the public interest." (*Tunkl v. Regents of University of California* (1963) 60 Cal.2d 92, 96, 98 (*Tunkl*).)

15

In *Tunkl*, *supra*, 60 Cal.2d 92, our high court identified six characteristics typical of contracts affecting the public interest: " '[1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.' " (*Id.* at pp. 98-101, fns. omitted.) Not all of these factors need to be present for an exculpatory contract to be voided as affecting the public interest. (*Id.* at p. 98.) However, in *Tunkl*, the Supreme Court found all six factors were implicated and, on that basis, concluded that a release from liability for future negligence imposed as a condition for admission to a charitable research hospital affected the public interest and was thus invalid. (*Id.* at pp. 94, 101-102.) In making this determination, our high court found "hardly open to question" the fact that "the services of the hospital to those members of the public who are in special need of the particular skill of its staff and facilities constitute a practical and crucial necessity." (*Id.* at p. 101.)

In contrast, California courts have consistently declined to apply the *Tunkl* factors to invalidate exculpatory agreements in the recreational sports context. (See *Street Racers*, *supra*, 215 Cal.App.3d 934 [upholding release in case claiming lack of competent medical attention/rescue equipment]; see also *Platzer v. Mammoth Mountain Ski Area* (2002) 104 Cal.App.4th 1253, 1259 [fall from chairlift during ski lesson]; *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 161-162 [swim class];

16

*Paralift*, *supra*, 23 Cal.App.4th at p. 756 [skydiving]; *Saenz*, *supra*, 226 Cal.App.3d at p. 764 [commercial river rafting]; *Madison*, *supra*, 203 Cal.App.3d at pp. 593, 597-599 [scuba diving]; *Okura v. United States Cycling Federation* (1986) 186 Cal.App.3d 1462, 1464, 1466-1468 [bicycle race].)  Although they acknowledge the current state of California law, the Hass Family invites us to revisit the issue based on an analysis of the *Tunkl* factors by the Washington Supreme Court in *Vodopest v. MacGregor* (Wash. Sup. Ct. 1996) 128 Wn.2d 840 (*Vodopest*).  In that case, the plaintiff agreed to join a mountain trek that was designed as a research trip to test the efficacy of a breathing technique used to eliminate high altitude sickness.  (*Id.* at pp. 843-844.)  Portions of the research proposal were submitted to the University of Washington Human Subjects Review Committee (University) for approval.  (*Id.* at p. 845.)  Prior to the trek, the plaintiff executed a broad release in researcher MacGregor's favor.  (*Ibid.*)  A similar release which included the University was rejected by the University as invalid because "releases from liability for negligence are not allowed as a part of any approved study, as the federal government does not allow exculpatory language in human subject experimentation."  (*Id.* at p. 846.)  Ultimately, the plaintiff suffered a cerebral edema from altitude sickness on the trek and sued MacGregor for negligence and gross negligence.  (*Id.* at p. 847.)

The sole issue on appeal in *Vodopest* was whether the release signed by the plaintiff violated public policy and was thus unenforceable.  (*Vodopest*, *supra*, 128 Wn.2d at p. 848.)  The court noted that medical research was a significant component of the trek and that the "critical question" in the case was "whether the alleged conduct giving rise to the cause of action for negligence occurred in the context of the mountain trekking or within the scope of the research project."  (*Id.* at pp. 850, 852-853.)  It concluded—after consideration of the six *Tunkl* factors—that to the extent McGregor attempted to use the release "to release herself as a researcher from negligent acts performed in the furtherance of medical research," it was unenforceable as violative of public policy.  (*Id.* at pp. 853-862.)  In particular, the court opined that "there are critical

17

public policy reasons to maintain the usual standard of care in settings where one person is using another as a medical research subject." (*Id.* at p. 856.)

*Vodopest* is obviously distinguishable on its facts and we reject the Hass Family's invitation to depart from long existing California precedent based on this Washington decision. Many recreational activities may require the ancillary provision of first aid or emergency medical services by event organizers, but that fact alone does not change such pursuits into anything other than the voluntary leisure pastimes that they are. In particular, with reference to the *Tunkl* factors, we note that half marathons are not an activity of great importance to the general public and are certainly not a matter of necessity. No racer is required to enter a particular event or to run it in any particular way. (Cf. *Okura*, *supra*, 186 Cal.App.3d at p. 1468 [bicycle race participant retains complete control and can drop out of the race or adjust his pace at any time; organizers have no control over how the participant approaches the race].) The *Tunkl* court, itself, made clear that such private, voluntary exculpatory contracts are permissible: "While obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, the above circumstances [admission to research hospital] pose a different situation. In this situation the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer." (*Tunkl*, *supra*, 60 Cal.2d at p. 101.) Here, Hass was permitted to make the voluntary decision, in return for being allowed to participate in the race, to shoulder the risk of RhodyCo's potential negligence. " ' " 'The power of the courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and . . . should be exercised only in cases free from doubt.' " ' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 777, fn. 53 (*Santa Barbara*).) We decline to exercise it here.

3. *Gross Negligence*

The final issue with respect to the impact of the Release in this matter is whether the Hass Family has raised a triable issue of material fact as to whether RhodyCo acted

18

with gross negligence in its management of the Half Marathon. Even if the Release was sufficient to block a claim for ordinary negligence—as we have held—it is insufficient, as a matter of public policy, to preclude liability for gross negligence. (*Santa Barbara*, *supra*, 41 Cal.4th at p. 751 ["an agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unenforceable as a matter of public policy"].) For purposes of this distinction, ordinary negligence "consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." (*Id.* at pp. 753-754.) " '[M]ere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty,' " amounts to ordinary negligence. (*Fritelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 48.) In contrast, " '[g]ross negligence' long has been defined in California and other jurisdictions as either a "want of even scant care" or "an extreme departure from the ordinary standard of conduct." ' " (*Santa Barbara*, *supra*, 41 Cal.4th at p. 754.) " ' "[G]ross negligence" falls short of a reckless disregard of consequences and differs from ordinary negligence only in degree, and not in kind.' " (*Gore v. Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 197 (*Gore*); see also *Anderson v. Fitness Internat., LLC* (2017) 4 Cal.App.5th 867, 881.) In assessing where on the spectrum a particular negligent act falls, " '[t]he amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk. As the danger becomes greater, the actor is required to exercise caution commensurate with it.' " (*Gore*, *supra*, 110 Cal.App.3d at p. 198.)

In the present case, we agree with both parties that the trial court erred by refusing to consider the Hass Family's claim of gross negligence because they had not pled gross negligence in their Complaint. Several appellate courts have opined that California does not recognize a separate cause of action for gross negligence. (*Saenz*, *supra*, 226 Cal.App.3d at p. 766, fn. 9; *Ordway v. Superior Court* (1988) 198 Cal.App.3d 98, 108, fn. 5, disapproved on other grounds in *Knight v. Jewett* (1992) 3 Cal.4th 296, 306-309 (*Knight*).) In *Santa Barbara*, the Supreme Court did not definitively resolve this issue, commenting only that it did not view its holding invalidating releases for future gross

19

negligence "as recognizing a cause of action for gross negligence." (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 779-780.) Instead, as is more relevant here, the high court went on to declare: "Our holding simply imposes a limitation on the defense that is provided by a release. A plaintiff is not required to anticipate such a defense [citation]; instead, the defendant bears the burden of raising the defense and establishing the validity of a release as applied to the case at hand." (*Id.* at 780, fn. 58.) Thus, regardless of whether gross negligence can be a separate cause of action, and/or the Hass Family could have alleged gross negligence in the Complaint in anticipation of RhodyCo's likely defense, they were not required to do so. The consequences of this pleading decision in the context of a summary judgment motion were summarized in *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715—which involved alleged negligence by a ski rental company in the adjustment of ski bindings—as follows: "Had plaintiff anticipated the defense of the release agreement in his complaint and alleged facts suggesting [its invalidity], the matter would have been a material issue which defendants would have had to refute in order to obtain summary adjudication." (*Id.* at pp. 1723-1724, 1739-1740; see also *id.* at p. 1740 [" 'If . . . the plaintiff pleads several theories or anticipates affirmative defenses by a show of excusing events or conditions, the challenge to the opponent is made by the complaint, requiring the moving defendant to affirmatively react to each theory *and* excusing or justifying event, or condition which supports a theory, if the motion is to be successful' "].) In contrast, "[s]ince plaintiff's complaint said nothing about the agreement, the matter of [its validity] was not a material issue for purposes of defendants' initial showing on its motion for summary adjudication. [The defendant] met its initial burden by adducing evidence of the . . . agreement and plaintiff's execution. The burden thereafter shifted to plaintiff to raise a triable issue of material fact." (*Id.* at p. 1740.)

Similarly, here, although the Hass Family set forth certain facts in the Complaint which could be viewed as supporting a claim of gross negligence, it cannot be said that the Complaint—which does not even mention the Release—anticipated the Release defense or raised gross negligence as a material issue which RhodyCo was required to

refute in order to succeed on summary judgment. Instead, RhodyCo met its initial burden by producing evidence of the existence of the Release and its execution by Hass. The burden then shifted to the Hass Family to raise a triable issue of material fact as to gross negligence.

Viewing the evidence in the light most favorable to the Hass Family, we believe they have met their burden in this case, making summary judgment inappropriate.[5] It is true that summary judgment on the issue of gross negligence may be warranted where the facts fail to establish an extreme departure from the ordinary standard of care as a matter of law. However, "[g]enerally it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence." (*Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 358.) In this case, there are clearly factual and credibility questions that need to be answered regarding exactly what was required under the terms of the EMS Plan. For example, there is conflicting evidence as to whether the "finish line" included the crowded post-race expo area for purposes of compliance with the EMS Plan, and it must also be established exactly what medical personnel and equipment were required to be stationed at the finish line. We will not here catalogue every conceivable argument that the Hass Family could present in an attempt to prove grossly negligent conduct by RhodyCo in this context. We conclude only that, viewing the evidence in the light most favorable to them, it is possible that the Hass Family could establish that, despite the potential for grave risk of harm in the sport of long-distance running, RhodyCo failed to implement the EMS Plan in several material ways and that its management of the Half Marathon—in particular with respect to the allocation of medical resources to the finish line and communication among race personnel—constituted an

---

[5] Both parties agree that the issue of gross negligence was adequately briefed before the trial court and urge us to reach the merits here. We are in accord and thus have independently reviewed the matter to determine whether a triable issue has been adequately presented. (See *Automobile Antitrust Cases*, *supra*, 1 Cal.App.5th at pp. 150-151 [" '[t]he sole question properly before us on review of the summary judgment [order] is whether the judge reached the right *result* . . . whatever path he [or she] might have taken to get there' "].)

extreme departure from the standard of care for events of its type. This is sufficient to raise a triable issue of fact with respect to gross negligence.[6]

In sum, we have concluded that the Release is not void on public policy grounds and that it is adequate to bar the Hass Family's action for ordinary negligence. However, since we have additionally determined that a triable issue of material fact exists as to whether RhodyCo's provision of emergency medical services was grossly negligent, the trial court's new trial order reversing its initial grant of summary judgment was appropriate, unless the Hass Family's negligence action is completely barred by the doctrine of primary assumption of the risk. We therefore turn finally to that question.

## C.     *Primary Assumption of the Risk*

In *Knight, supra*, 3 Cal.4th 296, the Supreme Court considered the continued applicability of the assumption of the risk doctrine in light of the court's prior adoption of comparative fault principles. (*Id.* at pp. 299-300.) Specifically, our high court distinguished between two different types of assumption of the risk: primary assumption of the risk—"those instances in which the assumption of risk doctrine embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk"—and secondary assumption of risk—"those instances in which the defendant does owe a duty of care to the plaintiff but the plaintiff knowingly encounters a risk of injury caused by the defendant's breach of that duty." (*Id.* at p. 308.) When

---

[6] We note in this regard that RhodyCo's track record prior to Hass's death, while exemplary, may be attributable to luck rather than expertise. Further, whether the 11-minute delay in applying the AED in this case was grossly negligent is a complex inquiry that cannot be established merely by reference to other cases in which various time delays were found not to raise a triable issue as to gross negligence. (See, e.g., *Grebing v. 24 Hour Fitness USA, Inc.* (2015) 234 Cal.App.4th 631, 639; *City of Santa Cruz v. Superior Court* (1988) 198 Cal.App.3d 999, 1002, 1007.) Finally, the fortuitous presence of Dr. Whitehill on the scene of Hass's collapse does not necessarily make any potential RhodyCo negligence immaterial. As the Hass Family convincingly states: "[P]laintiffs have never faulted RhodyCo for failing to provide a medical doctor to *personally deliver CPR*. They fault RhodyCo for failing to hire a medical doctor to act as the medical *director* to oversee the provision of emergency medical services—to ensure that the right medical personnel and equipment are provided and correctly deployed." Dr. Whitehill patently did not fulfill this role.

22

applicable, primary assumption of the risk "operate[s] as a complete bar to the plaintiff's recovery." (*Id.* at p. 315.)  In contrast, secondary assumption of the risk "is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties." (*Ibid.*; *id.* at p. 314 ["a jury in a 'secondary assumption of risk' case would be entitled to take into consideration a plaintiff's voluntary action in choosing to engage in an unusually risky sport . . . in determining whether or not the plaintiff should properly bear some share of responsibility for the injuries he or she suffered"]; see also *Kahn*, *supra*, 31 Cal.4th at p. 1003 [in a secondary assumption of the risk case, "the plaintiff's knowing and voluntary acceptance of the risk functions as a form of contributory negligence"].)

The Supreme Court further concluded in *Knight* that "the question whether the defendant owed a legal duty to protect the plaintiff from a particular risk of harm . . . [turns] on the nature of the activity or sport in which the defendant is engaged and the relationship of the defendant and the plaintiff to that activity or sport." (*Knight*, *supra*, 3 Cal.4th at p. 309.)  Although *Knight* dealt with the duty owed by a coparticipant in recreational activity (an informal touch football game on Super Bowl Sunday), it also discussed the potential liability here at issue, that of operators and organizers of recreational events.  (*Id*. at pp. 300-301, 315-317.)  For instance, the *Knight* court opined: "In the sports setting . . . conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself.  Thus, although moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them. [Citation.] . . .  [¶]  Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.  Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. *The cases establish that the latter type of risk,*

23

*posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant.*" (*Id.* at pp. 315-316, italics added.)  The high court also cited with approval a case involving an injury from a thrown baseball bat in which the jury returned a verdict in favor of the baseball player (since throwing bats is inherent in the game), but implicitly recognized "the duty of the stadium owner to provide a reasonably safe stadium with regard to the relatively common (but particularly dangerous) hazard of a thrown bat." (*Id.* at p. 317.)  Finally, *Knight* acknowledged a line of cases in which the duty of an operator is defined "by reference to the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport." (*Id.* at p. 317.)

Twenty years later, in *Nalwa v. Cedar Fair, L.P.* (2012) 55 Cal.4th 1148 (*Nalwa*), the Supreme Court revisited the scope of the primary assumption of the risk doctrine in the specific context of the duty owed by an operator/organizer.  The *Nalwa* court summarized the doctrine as follows:  " 'Although persons generally owe a duty of due care not to cause an unreasonable risk of harm to others (Civ. Code, § 1714, subd. (a)), some activities—and, specifically, many sports—are inherently dangerous.  Imposing a duty to mitigate those inherent dangers could alter the nature of the activity or inhibit vigorous participation.' [Citation.]  The primary assumption of risk doctrine, a rule of limited duty, developed to avoid such a chilling effect.  [Citations.]  Where the doctrine applies to a recreational activity, operators, instructors and participants in the activity owe other participants only the duty not to act so as to *increase*  the risk of injury over that inherent in the activity." (*Id.* at p. 1154.)  Applying this analytical framework to the case at hand, the high court concluded that the operator of a bumper car ride at an amusement park had no duty to protect the plaintiff from the collision which fractured her wrist.  (*Id.* at pp. 1152, 1157-1158, 1162-1163.)  Rather, "[l]ow-speed collisions between the padded, independently operated cars are inherent in—are the whole point of—a bumper car ride." (*Id.* at p. 1157.)  Thus, " '[i]mposing liability would have the likely effect of the amusement park either eliminating the ride altogether or altering its character to such a degree—by, for example, significantly decreasing the speed at which the minicars could

24

operate—that the fun of bumping would be eliminated, thereby discouraging patrons from riding.' " (*Id.* at pp. 1157-1158.)

Here, RhodyCo asserts that the primary assumption of the risk doctrine serves as a complete bar to the Hass Family's negligence claim, and thus the trial court erred in concluding otherwise. Specifically, RhodyCo argues that the risk of cardiac arrest is inherent to the sport of long-distance running and that, since it did nothing to increase Hass's risk of suffering cardiac arrest in the way it conducted the Half Marathon, it owed no further duty to the Hass Family. In particular, according to RhodyCo—under the test articulated in *Nalwa*—it had no duty minimize Hass' risk of death from cardiac arrest. Or, put another way, it had no duty to reduce the natural consequences of Hass's cardiac arrest or increase his chances of recovery.

In taking this position, RhodyCo acknowledges that the appellate court in *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173 (*Saffro*) held that a race producer has a duty to conduct a "reasonably safe event," which "requires it to take reasonable steps to 'minimize the risks without altering the nature of the sport.' " (*Id.* at p. 175.) In *Saffro*, a marathon runner suffered a grand mal seizure after a race and was diagnosed with severe hyponatremia, likely caused by his inability to consume adequate amounts of water and fluids containing electrolytes (such as Gatorade) during the race. (*Id.* at p. 176.) Although the race organizer sent written materials to participants prior to the event indicating that such liquids would be provided in sufficient quantities, the evidence suggested that they were not. (*Id.* at pp. 176-177.) The trial court granted summary judgment in favor of the race organizer, concluding that hyponatremia is an inherent risk of running a marathon. (*Id.* at pp. 177-178.) The appellate court reversed, stating that a race organizer's duty to conduct a reasonably safe event includes "the obligation to minimize the risks of dehydration and hyponatremia by providing adequate water and electrolyte fluids," especially where the race organizer had made representations to the participants that such fluids would be available. (*Id.* at p. 179.) Since Saffro had presented sufficient evidence to create a triable issue of fact as to whether the race organizer had breached this duty, summary judgment was improper. (*Id.* at pp. 179-181;

25

see also *Rosencrans*, *supra*, 192 Cal.App.4th 1072, 1079, 1082-1083 [although collisions with coparticipants are an inherent risk of motocross, operator of a motocross track has a duty to minimize this risk without altering the nature of the sport by providing a warning system, such as caution flaggers; triable issue of fact existed as to whether failure to provide a caution flagger constituted gross negligence].)  RhodyCo claims that *Saffro* is inapplicable both because it is a secondary assumption of the risk case and because the "duty to minimize risk" language from *Knight* that *Saffro* and other cases have "latched onto" is dicta which has been abrogated by the Supreme Court's subsequent decision in *Nalwa*.

We disagree with RhodyCo that the *Nalwa* court's formulation of the primary assumption of the risk doctrine somehow supplanted the high court's earlier discussion of the matter in *Knight*, particularly with respect to the Supreme Court's statements regarding an organizer/operator's duty "to minimize the risks without altering the nature of the sport." (See *Knight*, *supra*, 3 Cal.4th at p. 317.)  Rather, *Nalwa*—far from disagreeing with *Knight*— referenced it as the "seminal decision explicating and applying primary assumption of risk in the recreational context." (*Nalwa*, *supra*, 55 Cal.4th at p. 1155.)  Moreover, *Nalwa*'s formulation of the limited duty existing in a primary assumption of the risk case— "the duty not to act so as to *increase* the risk of injury over that inherent in the activity"—comes directly from *Knight*.  (*Nalwa*, *supra*, 55 Cal.4th at pp. 1154-1155, 1162-1163.)  Finally, and most importantly for our purposes, *Nalwa* did not reject cases such as *Saffro* and *Rosencrans* which concluded, based on language found in *Knight*, that operators/organizers have a duty to minimize risks without altering the nature of the sport.  (*Nalwa*, *supra*, 55 Cal.4th at p. 1163 & fn. 7.)  Instead, it characterized them as "decisions addressing the duty to reduce *extrinsic* risks of an activity" and found them distinguishable in that particular case because it concluded that the risk of injury from bumping—at any angle—was not an extrinsic risk, but was instead a risk *inherent* to riding bumper cars.  (*Id.* at pp. 1157-1158, 1163.)

Indeed, *Nalwa* expressly states that "[t]he operator of a bumper car ride might violate its 'duty to use due care not to increase the risks to a participant over and above

26

those inherent' in the activity (*Knight, supra*, 3 Cal.4th at p. 316) by failing to provide routine safety measures such as seat belts, functioning bumpers and appropriate speed control." (*Nalwa*, *supra*, 55 Cal.4th at p. 1163.) Thus, *Nalwa* actually reaffirms *Knight*'s conclusions regarding the duties owed to participants by operators/organizers of recreational activities. In short, such operators and organizers have two distinct duties: the limited duty not to increase the *inherent* risks of an activity under the primary assumption of the risk doctrine and the ordinary duty of due care with respect to the *extrinsic* risks of the activity, which should reasonably be minimized to the extent possible without altering the nature of the activity. *Nalwa* explains the interplay between these two types of duties by confirming that an operator or organizer's negligence with respect to extrinsic risks "might violate its 'duty to use due care not to increase the risks to a participant over and above those inherent' in the activity." (*Nalwa*, *supra*, 55 Cal.4th at p. 1163.)

In the present case, both parties acknowledge that cardiac arrest is an inherent risk of the sport of long-distance running. Further, it is not suggested on these facts that RhodyCo did anything that increased the risk that Hass would have a heart attack.[7] Moreover, requiring runners to slow down or take breaks in order to decrease this inherent risk would alter the character of racing to such a degree that it would likely discourage runners from participating. However, as both *Knight* and *Nalwa* teach us, this is not the end of the inquiry. While the operator or organizer of a recreational activity has no duty to decrease risks *inherent* to the sport, it does have a duty to reasonably minimize *extrinsic* risks so as not to unreasonably expose participants to an increased risk of harm. (*Nalwa*, *supra*, 55 Cal.4th at p. 1163 [while risk of injury from bumping bumper cars is generally low, an operator could violate its duty not to increase this inherent risk by

---

[7] In this regard, we do not find persuasive the Hass Family's related argument that, merely by putting on a large race event on public lands, RhodyCo increased the risk of harm inherent in long-distance running because the crowds and street closures disrupted the local 911 system. This risk appears typical of events of this type and would be understood as a risk inherent in participation. Indeed, the Hass Family's own expert opined that the applicable standard of care already takes such factors into account.

failing to provide routine safety measures]; *Knight*, *supra*, 3 Cal.4th at pp. 315-316 [negligent maintenance of towropes by ski resort could violate duty not to expose skiers to increased risk of harm]; *Grotheer v. Escape Adventures, Inc.* (2017) 14 Cal.App.5th 1283, 1297-1302 [crash landings caused by failure to safely pilot a hot air balloon are an inherent risk of hot air ballooning, but an operator has a duty not to increase that risk by failing to instruct participants on safe landing procedures, a customary practice in the ballooning industry]; *Jimenez v. Roseville City School Dist.* (2016) 247 Cal.App.4th 594, 610-611 [although contact with the floor is an inherent risk in dancing, school may have increased student's risk of harm through failure to properly disseminate its no-flip policy]; *Rosencrans*, *supra*, 192 Cal.App.4th at pp. 1083-1086 [negligent failure to provide collision warning system in motocross]; *Saffro*, *supra*, 98 Cal.App.4th at pp. 175, 179-181 [duty not to increase risk of dehydration and hyponatremia by unreasonably failing to provide adequate fluids]; *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 364-367 [although falling is an inherent risk of skiing, failure to mark off race area containing jumps which an ordinary skier would not expect to encounter may breach duty not to increase inherent risk]; *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, [although being hit by a golf ball is an inherent risk of golfing, golf course owner had a duty to design course to minimize the risk of being hit where possible without altering the nature of golf].) As the Fourth District recently opined in *Grotheer*, "[w]hat the primary assumption of risk doctrine does not do . . . is absolve operators of *any obligation* to protect the safety of their customers. (*Knight*, *supra*, 3 Cal.4th at pp. 317-318.) As a general rule, where an operator can take a measure that would increase safety and minimize the risks of the activity *without also altering the nature of the activity*, the operator is required to do so." (*Grotheer*, *supra*, 14 Cal.App.5th at p. 1300.) And, in *Solis*, the appellate court succinctly illustrated the issue raised by these cases as follows: "[F]alling off a horse is an inherent risk of horseback riding. But if a person put a barrel in the middle of the Churchill Downs racetrack, causing a collision and fall, we would not say that person owed no duty to the injured riders, because falling is an inherent risk of horseback riding." (*Solis*, *supra*, 94 Cal.App.4th at p. 365.)

28

When viewed under this analytical framework, *Rotolo v. San Jose Sports & Entertainment, LLC* (2007) 151 Cal.App.4th 307 (*Rotolo*), disapproved on another ground as stated in *Verdugo v. Target Corp.* (2014) 59 Cal.4th 312, 327, and *Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 (*Connelly*)—two cases relied upon by RhodyCo—are not inconsistent. In *Rotolo*, parents of a teenager who died as a result of sudden cardiac arrest while playing ice hockey sued the ice hockey facility for wrongful death, claiming that the facility had a duty to notify facility users of the existence and location of the facility's AED. (*Rotolo*, *supra*, 151 Cal.App.4th at p. 313.) The appellate court disagreed, noting that sudden cardiac arrest is a risk inherent in playing strenuous sports and that the facility had done nothing to increase this risk. (*Id.* at p. 334.) During the course of its analysis, the *Rotolo* court stated: "We have found no authority for the proposition that a sports facility operator has a duty to reduce the effects of an injury that is an inherent risk in the sport, or to increase the chances of full recovery of a participant who has suffered such a sports-related injury, or to give notice regarding any first aid equipment that may be available for such a purpose." (*Id.* at pp. 334-335.) In making this determination, however, the *Rotolo* court searched exhaustively for a duty that the facility could have breached in this context and could not find one. (*Id.* at pp. 319-339.) In particular, it noted that the facility had not breached its duties to keep the property in a reasonably safe condition or to summon emergency medical aid.[8] (*Id.* at pp. 316-317, 332-334.) Since the sports facility had not acted negligently with respect to any risks extrinsic to the sport of hockey, thereby increasing its inherent risks, the primary assumption of the risk doctrine barred recovery. (*Id.* at 334-335.) Similarly, in *Connelly,* the plaintiff argued that the ski resort had insufficiently padded a ski lift tower, thereby causing him serious injury when he collided with it. (*Connelly*, *supra*, 39 Cal.App.4th at

---

[8] Indeed, the *Rotolo* court expressly distinguished secondary assumption of the risk cases—in which "the owner or operator of a sports facility has contributed to the harm by designing or maintaining a facility in such a way as to unreasonably increase the risks inherent in the sport"—on this basis. (*Id.* at p. 334.) Here, as discussed above—and in obvious contrast to *Rotolo*—RhodyCo was required to create and implement an approved EMS Plan as a condition of its permit authorizing the race and attendant street closures.

pp. 10-11.) The appellate court concluded that colliding with a ski lift tower is an inherent risk of skiing and that the ski resort had done nothing to increase this risk by padding the towers, which the resort had no duty to do in the first place. (*Id.* at p. 12-13.) In essence, the court concluded that the ski resort had not breached its underlying duty to provide a reasonably safe ski resort and thus the primary assumption of the risk doctrine barred the plaintiff's negligence action. (See *id.* at pp. 11-14.)

It is undisputed in this case that RhodyCo has provided event management and production services for "high profile" running and walking events for over 25 years and that, while these events involved over 1.5 million participants, Hass was the first fatality. Thus, while death from cardiac arrest is undeniably a risk associated with long-distance running, it appears from RhodyCo's own facts to be a slight one. The question therefore remains whether RhodyCo, as the organizer of the Half Marathon, acted negligently in its provision of emergency medical services—a risk extrinsic to the sport of long-distance running—in such a way that it exposed Hass to an increased risk of harm over and above that generally inherent in the activity itself. Since we have previously concluded that the Hass Family has raised a triable issue of fact as to whether RhodyCo was grossly negligent in this regard, the primary assumption of the risk doctrine does not act as a complete bar to the present negligence action.[9] The trial court's decision to reverse itself on this ground and allow the case to continue was therefore not error.

As a final matter, we note that imposing a duty of due care with respect to "extrinsic" risks for operators and organizers of recreational activities makes sense based on the policies underlying the primary assumption of the risk doctrine. As stated above and as articulated in *Nalwa, supra,* 55 Cal.4th at pages 1156-1157: "The primary

---

[9] Although, under a secondary assumption of the risk analysis, Hass might ultimately be found to have contributed to his risk of injury by voluntarily engaging in the sport of long-distance running. (See *Knight*, *supra*, 3 Cal.4th at p. 314.) Thus, RhodyCo's attempt to distinguish secondary assumption of the risk cases as irrelevant to a primary assumption of the risk analysis is not well taken. Such cases are highly relevant because they involve potential breach of an underlying duty which increased the inherent risk of the activity in question, making primary assumption of the risk inapplicable.

30

assumption of risk doctrine rests on a straightforward policy foundation: the need to avoid chilling vigorous participation in or sponsorship of recreational activities by imposing a tort duty to eliminate or reduce the risks of harm inherent in those activities. It operates on the premise that imposing such a legal duty 'would work a basic alteration—or cause abandonment' of the activity. . . . [¶] . . . Allowing voluntary participants in an active recreational pursuit to sue other participants or sponsors for failing to eliminate or mitigate the activity's inherent risks would threaten the activity's very existence and nature." (*Id.* at pp. 1156-1157.) Moreover, "active *recreation*, because it involves physical activity and is not essential to daily life, is particularly vulnerable to the chilling effects of potential tort liability for ordinary negligence." (*Id.* at p. 1157.) The *Nalwa* court counseled that the doctrine's parameters should be drawn according to this underlying policy goal. (*Ibid.*) Obviously, requiring an operator or organizer of recreational activities to provide a reasonably safe event, reasonably maintained attractions, and/or customary safety warnings—far from chilling vigorous participation in such activities—would almost certainly increase their attractiveness to potential participants. Moreover, an owner or event organizer is still protected from liability with respect to the *inherent* risks of these activities. And, given that participation in these recreational pursuits is almost always contingent on the signing of a release, such owners and organizers are generally also relieved of the consequences of their ordinary negligence. Allowing owners and organizers to avoid accountability for their gross negligence in this context, based on the primary assumption of the risk doctrine, would contravene public policy, not support it. (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 750-751; see also *id.* at pp. 767-776 [rejecting as unsupported by empirical evidence the assertion that refusing to uphold agreements releasing liability for future gross negligence will lead to the extinction of many popular and lawful recreational activities].)

### III.    DISPOSITION

The judgment is affirmed in part and reversed in part, and the matter remanded for further proceedings consistent with this opinion. In particular, the trial court is instructed

to enter an order denying RhodyCo's motion for summary judgment. The Hass Family is entitled to its costs on appeal.

_____
REARDON, J.


We concur:


_____
STREETER, ACTING P. J.


_____
SMITH, J.*


*Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A142418 *Hass v. RhodyCo*

33

Trial Court:                    City and County of San Francisco Superior Court


Trial Judge:                    Hon. A. James Robertson II


Counsel for Plaintiffs and      Lewis Brisbois Bisgaard & Smith LLP
Appellants:                     Jeffry A. Miller
                                Lann G. McIntyre
                                Shawn A. Toliver
                                Helen L. Greenberg


Counsel for Defendant and       Law Office of Gerald Clausen
Respondent:                     Gerald Clausen

                                Abramson Smith Waldsmith LLP
                                Robert J. Waldsmith
                                Jeffrey R. Smith

A142418 *Hass v. RhodyCo*