Filed 11/2/20  Washington v. Rosales CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PATRICIA WASHINGTON,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>ALISSON ROSALES,<br><br>    Defendant and Respondent. | G058187<br><br>(Super. Ct. No. 30-2017-00898817)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Craig L. Griffin, Judge.  Affirmed.

Hunt & Adams and John C. Adams III for Plaintiff and Appellant.

Law Office of Anthony T. Schneider and Darren P. Johnson for Defendant and Respondent.

\*        \*        \*

Patricia Washington appeals from the judgment entered after the trial court granted defendant Alisson Rosales's motion for summary judgment. Washington sued Rosales, the instructor of a "boot-camp" group fitness class, alleging her negligence was a cause of Washington's injury during the class. Rosales moved for summary judgment on the basis that Washington signed a release that waived any liability claims arising out of her participation in the class.

Washington contends the judgment must be reversed because (1) the court erred by concluding the 2014 release was not rendered unenforceable by the Health Studio Services Act (Civ. Code, § 1812.80 et. seq.), (2) the court erred by shifting the burden to her to demonstrate a triable issue of fact on the issue of gross negligence, which would not be subject to waiver, (3) the court erred by sustaining Rosales's objections to the declaration of her expert witness, and (4) there were triable issues of fact pertaining to whether Rosales's supervision of the class was grossly negligent. We find no error and affirm the judgment.

The Health Studio Services Act is a consumer protection law that applies to membership agreements; it creates specific limits on the financial commitments that may be extracted from health and fitness club members. It has no applicability to a tort liability waiver that establishes no membership or financial commitments. Moreover, Rosales's motion was grounded on her affirmative defense of release, rather than on an assertion that one or more of the elements of Washington's negligence cause of action could not be proven. Therefore the burden properly shifted to Washington, once Rosales presented prima facie evidence of the release, to demonstrate why the release did not relieve Rosales of liability. We find no error in the court's evidentiary rulings because (1) the expert never identified the source or substance of the "industry practices" and "safety standards" he relied on in opining that Rosales's management of her class was grossly negligent; (2) he improperly opined about the facts of the case; and (3) many of his opinions were irrelevant to the circumstances of Washington's injury. And finally,

2

the evidence offered by Washington was insufficient to establish a triable issue of fact on the issue of gross negligence because she produced no evidence to support her expert's opinion that Rosales's class was dangerously configured at the time of her injury.

## FACTS

Rosales is the owner and operator of Fit Body Boot Camp Foothill Ranch. The boot camp classes involve a variety of exercises, some involving weights, that are designed to provide a full body workout. Washington, a medical doctor who claims she is no longer able to practice her medical specialty due to the injuries she suffered in this accident, began participating in Rosales's boot camp classes in 2012. She signed an "acknowledgement and assumption of risk and full liability" around that same time. In the year before her injury in 2016, Washington regularly attended classes, often six days per week.

In 2014, Washington signed a second "waiver and release of liability" that states she "waive[s] any and all rights, claims or causes of action of any kind whatsoever arising out of my participation in the Activity, and do[es] hereby release and forever discharge Fit Body Boot Camp, . . . their affiliates, managers, members, agents, attorneys, staff volunteers, . . . for any physical or psychological injury, including but not limited to illness, paralysis, death, damages, economical or emotional loss, that I may suffer as a direct result of my participation in the aforementioned Activity." The waiver goes on to explicitly acknowledge that injuries may be caused by the "actions of others, including but not limited to, participants, volunteers, spectators, coaches, event officials and event monitors." And finally, the waiver expressly includes a waiver of claims "for negligence on the part of Fit Body Boot Camp, Foothill Ranch, its agents, and employees."[1]

---

[1] The 2012 release was not offered into evidence, and thus its specific terms remain unclear. Rosales asserted that Washington signed a third release in 2016, but

3

According to Rosales, she had all participants in her boot camp classes, including Washington, sign the 2014 release because it had been updated to reflect the inclusion of rope climbing activities.  In her deposition, she recalled that Washington signed the 2014 release in her presence, at her Foothill Ranch Boot Camp location.

According to Washington, she complained to Rosales about another participant in the Boot Camp class, Stephanie Crowther, in February 2016, after Crowther ran into her during a running exercise.  Before that incident, Washington had never experienced any similar collisions in the boot camp class.

On March 2, 2016, Washington was participating in a morning boot camp class with what she estimated to be "[o]ver 60" participants.[2]  Following an initial warm-up, the class engaged in a "farmer's carry" exercise, in which the participants walked the length of a mat (later established to be 150-feet-long and 50-feet-wide) and then back, with their arms at their sides and weights in each hand.  According to Washington, participants followed their "own speed and path" during the exercise, and there were other participants in front of and behind her, to her left and right, and walking toward her.  Washington estimated that one person was about five feet in front of her and a person to her left was seven feet away.  She did not know how far away any person behind her might have been.

Washington first saw Crowther when Washington was just beginning her farmer's carry.  Crowther was five to six feet away, approaching Washington's right side from the opposite direction, and walking at a similar pace.  Washington kept her eyes on Crowther; she shifted her course by taking one step to her left in order to give Crowther

---

Washington affirmatively denied signing that one.  Consequently, Washington took the position that "the only release of relevance here is that one from 2014."

[2]     Other witnesses recalled the class size as being significantly smaller, but for our purposes that dispute of fact is irrelevant.

more space. At about the same time, Crowther shifted her course toward Washington, and the weight in Crowther's right hand (the hand closer to Washington) was "suspended away from her body." When the two passed each other, the weight Crowther was holding out away from her body struck Washington in the hand causing her injury.

Before the collision between Washington and Crowther, Rosales had never seen anyone "stray off their path and present a danger to another person" during the farmer's carry exercise in any of her classes.

Washington filed her complaint in January 2017, alleging causes of action against Crowther and other defendants, including Fit Body Boot Camp Foothill Ranch. Her second amended complaint (SAC) states causes of action for assault, battery and intentional infliction of emotional distress against Crowther, and a cause of action for negligence against Crowther, Fit Body Camp Foothill Ranch, and other defendants, including Doe defendants.

In support of the negligence cause of action, Washington alleges that Crowther "negligently and/or intentionally struck [Washington] with a weight she was carrying, thereby causing [Washington] to be injured."[3] Washington further alleges that Fit Body Boot Camp Foothill Ranch and the other defendants were "grossly negligent and careless" in the operation of the class, and "knew or in exercise of reasonable care should have known that the . . . area chosen for the group physical training program, the number of individuals participating therein and the manner in which the group physical training program was conducted, constituted a dangerous and an unreasonable risk of harm of which [Washington] at all times was unaware of." The SAC alleges specifically that the defendants "failed to use the appropriate space, failed to adequately limit the

---

[3]     In the causes of action against Crowther, Washington alleges she "swung a weight at [her]" intentionally, with the intent to cause Washington to apprehend an immediate harmful contact, and also that Crowther acted "knowingly, intentionally, willfully, wantonly, recklessly and maliciously" in striking her with the weight.

5

number of individuals engaged in the group exercise program at the time, failed to adequately instruct members on how to safely perform exercises, failed to adequately supervise the members, . . . failed to take steps to either make the conditions at the [class] safe or warn [Washington] of the dangers, . . . and failed to have adequate safety rules and regulations in place."

In September 2018, Washington filed an amendment to the SAC, naming Rosales in place of Doe 1.

In October 2018, Rosales moved for summary judgment, relying on her affirmative defense that Washington waived any claim against her. She filed a declaration stating that Washington signed a release when she began taking classes in 2012 (although the document itself could not be located), and that Washington signed a second release in 2014, and a third one in 2016; the latter two releases were submitted as exhibits in support of the motion.

Additionally, Rosales confirmed she was the instructor during the boot camp class where Washington was injured, and declared she "was actively involved in the class to ensure that the activities were performed safely and properly, as I always am."[4]

Rosales's defense of her class management was also supported by Stephanie Crowther's deposition testimony. Crowther described Rosales as an "excellent" trainer, and testified that all of the trainers in the Fit Body Boot Camp classes "would always go over proper technique to prevent injury . . . so we were clear on . . . how we were to perform it," and would circulate among the participants during the exercises to ensure they were doing the exercises correctly. Crowther further testified that on the morning Washington was injured, the boot camp class included about 25-30

[4]     Washington filed objections to Rosales's declaration, but the trial court overruled them. On appeal, Washington does not challenge that aspect of the court's ruling.

regulars and was not overcrowded. Rosales expressly relied on those facts in the separate statement she filed in support of her summary judgment motion.

In her opposition, Washington acknowledged signing a waiver of liability when she began taking Rosales's boot camp classes in 2012, but stated she did not remember signing one thereafter. While Washington affirmatively disputed the validity of the 2016 release, claiming she did not sign it, she did not deny signing the 2014 release.[5]

Washington also argued that Rosales's management of her boot camp class was deficient, and that the various deficiencies she identified amounted to gross negligence which is not subject to waiver. Washington relied on the declaration of an expert witness, Kurt Baker, to create a triable issue of fact on her claim of gross negligence. In his declaration, Baker described himself as an expert on physical training and issues relating to the health and fitness industry. He stated he has been retained in several legal matters to offer professional opinions involving "published professional standards" related to the fitness industry.

Baker explained that in his capacity as Washington's retained expert, he reviewed various materials, including the second amended complaint, the motion for summary judgment, the depositions of Washington, Rosales, and two other witnesses— one a former trainer employed by Rosales, the other a participant in the class in which Washington was injured—and what he described as "photographs obtained from the Fit Body Boot Camp Foothill Ranch Face Book page." Baker claimed he "gleaned" certain facts about Rosales and her classes from those materials.

---

[5]     In her response to the assertion in Rosales's separate statement that she had executed several waivers, Washington stated she "has never been asked to authenticate the alleged 2014 release" but did not dispute its validity. By contrast, she specifically disputed the validity of the 2016 release.

Among other things, Baker opined that with respect to this specific boot camp class, "there may have been over 60 members present in the class," that "everyone . . . was performing the [farmer's carry] exercise at the same time," and thus that "there could have been as many as 20 members per row" during the exercise. He determined that Rosales was the sole trainer present during the class, and that the injury happened after "Crowther did not maintain her lane and collided with [Washington], striking [her] right hand with [a] dumbbell."

Baker also offered opinions that related more generally to Rosales's classes and the way in which she conducted them. For example, Baker concluded "many of [the participants in the classes] were unable to perform the exercises" and "[Rosales] did not provide any training on the safe performance of the farmer's carry." Baker also declared that "[Rosales] did not set any safety guidelines," or "maintain any written safety material," and that "trainers had expressed concerns to [Rosales] about class sizes" and "available space" and about "collisions between members."[6]

Baker finally concluded that Rosales's management of the class at issue amounted to "gross negligence" because she "failed to review and adhere to industry standards and guidelines when she allowed up to 60 students to perform the farmer's carry at the same time" and when she "allowed members to walk in opposite directions with minimum spacing and multiple rows." Baker neither identified the source of nor summarized the content of the "standards and guidelines" he believed Rosales was required to adhere to.

---

[6] Baker's suggestions that "trainers" had expressed concerns about class size was apparently based on his review of the deposition of Edith Van Den Ordel, a trainer who formerly worked for Rosales. She testified that she had expressed concern to Rosales about the size of the classes, telling her "it's running into issues where people are colliding with each other, or they are not paying attention to the fact that *when they get up and start sprinting, they may have to keep an eye out for someone else who may be getting up at the same time*." (Italics added.)

Baker also asserted Rosales "should have had an appreciation" of the risk that members might lose their balance because of fatigue, and "should have known that the 50 ft. wide mat could only safely accommodate a row of 7-8 members." He declared she "made the exercise exceedingly unsafe by having more than double that many members per row." Baker also faulted Rosales for "fail[ing] to provide her members with at least 3-4 ft[.] of space in any direction, since they were employing dumbbells in the exercise."

Baker opined that Rosales had a "fundamental duty . . . to provide a safe environment," which included a "duty to organize the class so as to minimize the potential risks." With respect to the farmer's carry specifically, he claimed Rosales could have "avoid[ed] the possibility of a member injuring another" by organizing the class into rows of seven members and having each participant stop after completing a length of the mat, returning only when all participants had completed that first length. He did not identify any established industry standards governing how the farmer's carry should be performed, nor did he claim that a majority of instructors actually conduct it in the manner he suggested.

Rosales objected to many of the assertions contained in Baker's declaration, grouping the challenged assertions into four distinct groups and objecting to each group on several grounds.[7] Specifically, she objected to his assertions that "there may have been over 60 members present in the class" and "there could have been as many as 20 members per row," on the grounds that such equivocal statements address possibilities, which are insufficient to establish a prima facie case. She also objected to several of Baker's specific claims of negligence, as well as his conclusions that her negligence "rise[s] to the level of gross negligence" and "caused [Washington] to be

<hr>

[7] Rosales also objected to the entirety of Baker's declaration, on the ground it was not properly signed. The court overruled that objection.

injured," on the basis they lacked foundation and were conclusory, were speculative, or that they were irrelevant to the specific incident at issue.

The court granted Rosales's motion for summary judgment, relying on the 2014 release to establish Washington's waiver of any tort claims relating to her participation in Rosales's class. The court noted that public policy prohibits the release of a claim based on gross negligence, but concluded there was no evidence Rosales had engaged in gross negligence in connection with Washington's injury.

The court sustained all of Rosales's substantive objections to Baker's declaration, noting that Baker failed to define any "industry standards" applicable to the farmer's carry exercise. The court also pointed out that the ability to assess how crowded a workout class is, and to recognize the fact that increased participation would likely also increase the likelihood participants might run into each other, do not require any particular expertise. The participants themselves were capable of understanding that. As the court described it, "If it's too crowded, anybody can see. Gee, I'm worried I might bump into someone. [¶] There is nothing hidden, nothing unknown."

## DISCUSSION

1. *Summary Judgment Standards*

Any party to an action may move for summary judgment. (Code Civ. Proc., § 437c, subd. (a); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826 (*Aguilar*).) The object of the summary judgment procedure is "to cut through the parties' pleadings" to determine whether trial is necessary to resolve their dispute. (*Aguilar*, at p. 843.)

"A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty . . . ." (Code Civ. Proc., § 437c, subd. (f)(1).) "A motion for summary adjudication may be made by itself or as an alternative to a motion

for summary judgment and shall proceed in all procedural respects as a motion for summary judgment." (*Id*., subd. (f)(2).)

"[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra*, 25 Cal.4th at p. 850.) "A prima facie showing is one that is sufficient to support the position of the party in question." (*Id.* at p. 851.) A defendant moving for summary judgment may satisfy her initial burden either by producing evidence of a complete defense or by showing the plaintiff's inability to establish a required element of the case. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 853.)

If a moving defendant makes the necessary initial showing, the burden of production shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra*, 25 Cal.4th at p. 850.) If the plaintiff opposing summary judgment presents evidence demonstrating the existence of a disputed material fact, the motion must be denied. (*Id.* at p. 856.)

In evaluating the summary judgment motion and opposition, the trial court "must consider all of the evidence and all of the inferences drawn therefrom." (*Aguilar, supra*, 25 Cal.4th at p. 856.) The moving party's evidence is strictly construed, while the opponent's evidence is liberally construed. (*Id.* at p. 843.)

On appeal, we review the summary judgment on a de novo basis. (*Aguilar, supra*, 25 Cal.4th at p. 860.) "In undertaking our independent review of the evidence submitted, we apply the same three-step analysis as the trial court." (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1431.) "First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Id.* at p. 1432.)

2.     *Enforceability of Waiver*

Washington first contends the court erred by granting summary judgment because her 2014 release of liability was governed by the Health Studio Services Act (Civ. Code, § 1812.80 et seq. (the Act)).  As she correctly points out, the Act requires that every contract for health studio services "shall be in writing" and that "[a] copy of the written contract shall be physically given to or delivered by email to the customer at the time he or she signs the contract," (Civ. Code, § 1812.82) and she asserts there is no evidence she was given a copy of her release.  We find no error in the court's analysis.

The Health Services Studio Act—originally called the Dance and Health Studio Act (see Stats. 1969, ch. 1571, § 2)—was enacted to protect consumers by addressing financial abuses in the membership and service contracts obtained by dance and health studios.  (Civ. Code, § 1812.80; *People v. Arthur Murray, Inc.* (1965) 238 Cal.App.2d. 333, 343.)  The Act governs "contract[s] for health studio services," which is defined as "a contract *for instruction, training or assistance* in physical culture, body building, exercising, reducing, figure development, or any other such physical skill, *or for the use by an individual patron of the facilities* of a health studio, gymnasium or other facility used for any of the above purposes, *or for membership* in any group, club, association or organization formed for any of the above purposes."  (Civ. Code, § 1812.81, italics added.)

The Act states that every such contract for health studio services "shall be subject to the provisions of this title" (Civ. Code, § 1812.82), which include restrictions on the term of the contract and the length of any financing of payment obligations (Civ. Code, § 1812.84), a cap on the total financial commitment that can be agreed to (Civ. Code, § 1812.86), a guaranteed right of cancellation under certain circumstances (Civ. Code, § 1812.85), and automatic relief from payment obligations if the patron dies or becomes disabled (Civ. Code, § 1812.89).  The Act also includes a provision prohibiting health studios from securing payment by way of "any note or series of notes by the buyer

12

which when separately negotiated will cut off as to third parties any right of action or defense which the buyer may have against the seller."  (Civ. Code, § 1812.87; see also Civ. Code, § 1812.88 [protecting patrons from losing any rights or defenses in the case of contract assignment].)

The Act says nothing about tort liability waivers, and the trial court concluded the Act was inapplicable to the release signed by Washington because the document contained none of the elements the Legislature identified as comprising a "contract for health studio services"—i.e., "[it did] not provide [her] with any vested rights to participate in classes, to access the venue, or to hold membership in any club."

Washington contends the court's "very narrow" interpretation of what she characterizes as a "broadly worded consumer protection and safety oriented enactment" cannot be justified by either the words of the Act or the established rules of statutory construction.  But she fails to support that contention with an analysis of either the words of the Act or the rules of statutory construction.   In short, she fails to explain *why* the trial court's interpretation is wrong.

We conclude it is not.  The trial court concentrated on the words of the Act in assessing whether Washington's 2014 release qualified as a "contract for health studio services" as defined in the Act.  As the court noted, it satisfies none of the criteria.  And even if there were some lack of clarity in the words of the Act, and we were required to construe them "in light of the nature and obvious purpose of the statute" (*Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 354), that construction would not support Washington's claim.  The Act focuses on restricting potential *financial* abuses and overreach in health studio services contracts.  There are no provisions in the Act reflecting concerns about liability waivers.

In the absence of any indication the Act was intended to restrict or regulate liability waivers in connection with health services—as distinguished from contracts

13

establishing financial obligations—we find no error in the trial court's determination it is inapplicable to the 2014 release signed by Washington.

        3.      *Error in Shifting Burden of Production*

        Washington next contends the court erred by shifting the burden to her to demonstrate a triable issue of fact regarding gross negligence. She relies on *Kim v. County of Monterey* (2019) 43 Cal.App.5th 312, 323 (*Kim*), for the proposition that Rosales had the initial burden to establish the nonexistence of negligence, and that her failure to bear that burden meant the motion should have been denied without ever shifting the burden to produce any evidence to Washington. The contention fails.

        *Kim* correctly summarizes the applicable rule: "'A defendant moving for summary judgment has the burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established *or there is a complete defense to that cause of action.*'" (*Kim*, *supra*, 43 Cal.App.5th at p. 323, italics added.) In this case, Rosales's motion was based on her affirmative defense of waiver, rather than on negating any of the elements of Washington's negligence cause of action. Consequently, once she established prima facie evidence of a relevant release executed by Washington—a valid defense to a cause of action for negligence—the burden shifted to Washington to demonstrate a triable issue of disputed fact.

        It makes no difference that Washington characterized the negligence as "gross" in the allegations of her complaint, [8] and that liability caused by gross negligence is not subject to waiver. (See *Santa Barbara, supra*, 41 Cal.4th at p. 751 ["an agreement made in the context of sports or recreational programs or services, purporting to release liability for future gross negligence, generally is unenforceable as a matter of public policy"].) There is no separate cause of action for "gross negligence." (*Id.* at

---

[8]     Gross negligence is generally defined as "either a ""want of even scant care"" or ""an extreme departure from the ordinary standard of conduct."""" (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754 (*Santa Barbara*).)

14

pp. 779-780.) Washington's use of that word did not alter the fact that her cause of action was for negligence—and thus waiver was presumptively a defense to that cause of action.

As explained in *Haas v. RhodyCo Productions* (2018) 26 Cal.App.5th 11, 33, it is only when a plaintiff affirmatively acknowledges the existence of a waiver agreement in her negligence cause of action, and then alleges additional facts demonstrating the waiver is unenforceable due to gross negligence, that the defendant would have an affirmative duty to negate those allegations of unenforceability when she moves for summary judgment based on the defense. In this case, where the existence and unenforceability of the waiver was not affirmatively alleged as in the complaint, Rosales had no obligation to offer evidence negating the issue of gross negligence in her motion for summary judgment. Instead, she met her initial burden to defeat a cause of action for negligence by "producing evidence of the existence of the Release and its execution by [Washington.] The burden then shifted to [Washington] to raise a triable issue of material fact as to gross negligence." (*Ibid.; s*ee *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1739-1740 ["Had plaintiff anticipated the defense of the release agreement in his complaint and alleged facts suggesting [its invalidity], the matter would have been a material issue which defendants would have had to refute in order to obtain summary adjudication"].)

In any event, if Rosales had the initial burden to negate the existence of gross negligence, we would conclude she did so here. The evidence offered in support of her motion included evidence that she was an "excellent" trainer, that she personally supervised the class in which Washington's injury occurred, and that she "was actively involved in the class to ensure that the activities were performed safely and properly." Rosales also offered evidence that the class included only 25-30 participants, and it was not overcrowded as Washington alleged.

That evidence is sufficient to negate the factual allegations underlying Washington's claim of negligence, and thus establish a prima facie showing that Rosales was not "grossly" negligent in her management and supervision of the class in which Washington was injured. "Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented. [Citations.] It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences." (*Evans v. Paye* (1995) 32 Cal.App.4th 265, 280-281, fn. 13.)

4.      *Rosales's Objections to Baker's Deposition*

Washington also contends the court erred by sustaining Rosales's objections to the declaration of her expert witness, Kurt Baker. As we have already noted, Rosales's objections pinpointed specific assertions made in Baker's declaration, organized them into four groups, and made specific objections to each group. Washington fails to acknowledge any of that—indeed, her argument does not identify any of the individual statements objected to, let alone evaluate how those statements should have fared against the objections asserted by Rosales and sustained by the trial court.

Instead, Washington appears to be under the misapprehension that Rosales made each of her objections to the entirety of Baker's declaration. She complains, for example, that objections such as "lacks foundation," "improper expert opinion" and "irrelevant" "are simply not *a basis for excluding wholesale the entirety* of all of Mr. [Baker's] opinions, 'assumptions', 'facts' or other materials upon which he bases his expert testimony." (Italics added.) That may be correct, but that is not what Rosales did here.

Having failed to acknowledge the specific statements Rosales objected to, or to explain why the objections were not appropriately sustained as to those individual statements, Washington has waived any claim of error in the court's ruling. "It is not our

16

place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness. When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

But even if the point had not been waived, Washington's arguments are unpersuasive. She makes sweeping arguments about the propriety of expert declarations in general, and in the context of summary judgments, and then asserts that her reliance on Baker's declaration served that proper function. We agree with several of her assertions—e.g., that experts may rely on "foundational materials" in forming their expert opinions, that "'industry practices'" and "'safety standards'" are relevant in determining whether a particular exercise in a fitness class was properly conducted, and that an expert declaration can be used to create a triable issue of fact in opposition to summary judgment.

However, none of those abstract points persuades us that Baker's declaration was entirely admissible in this case. As the trial court noted, Baker's declaration alluded to the existence of certain "industry standards"—in fact, Baker specifically chided Rosales for "fail[ing] to review and adhere to" those standards—without identifying either the source or the substance of the standards. Baker's conclusory assertion about the existence of such standards provided an insufficient foundation for his subsequent opinion that Rosales's conduct was negligent. "[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510.)

Baker's declaration also included affirmative statements about the facts of the case, apparently derived from his review of depositions and other evidence. While Washington is correct that Baker can (and perhaps must) identify the facts he is relying

17

upon in forming his opinions, his declaration does not prove the existence of those facts. The expert witness has no personal knowledge of what occurred. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 686 ["What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception"].)

And that is only part of the problem with Baker's statements that "there may have been over 60 members present in the class [in which Washington was injured]" and "there could have been as many as 20 members per row [during the exercise in which Washington was injured]." As Rosales pointed out in her objections, such speculative statements are insufficient to establish a prima facie case (*Johnston v. Brother* (1961) 190 Cal.App.2d 464, 473 ["Verdicts cannot be based on mere surmise, speculation, conjecture or guesswork. Mere possibility alone is not sufficient"]) and are an improper basis for an expert opinion (*People v. Richardson* (2008) 43 Cal.4th 959, 1008 ["the expert's opinion may not be based . . . on speculative or conjectural factors"]).

Finally, many of the facts considered by Baker as a basis for concluding Rosales was grossly negligent were irrelevant to the incident at issue in this case. It may be true that Rosales did not provide the other trainers she employed with "safety training," that she did not "hold regular safety meetings with trainers," and that she "encouraged the music to be played loudly." But there is no indication that those factors had any impact on the class in which Washington was injured, since Rosales herself supervised that class, and there was no claim that loud music affected it. As a consequence, we cannot conclude the trial court erred in sustaining objections to those statements.

For all of these reasons, we find no error in the trial court's evidentiary rulings.

5.    *Gross Negligence*

Finally, Washington contends the summary judgment must be reversed because she provided sufficient evidence to raise a triable issue of fact on the issue of whether Washington's injury was caused by Rosales's gross negligence. We cannot agree.

When the irrelevant aspects of Baker's declaration are set aside, Washington's negligence claim against Rosales boils down to the assertion that Rosales allowed the boot camp class in which Washington was injured to be overcrowded, and did not ensure proper spacing between the members as they performed the farmer's carry exercise. However, Baker himself acknowledged that the sheer number of participants in the class was not the problem, opining that the class could have been configured to "avoid the possibility of a member injuring another" even with the large number of participants. For example, he suggested Rosales "could have organized the class into rows of 7 members and had each row stop after completing a length," or she could have "divid[ed] the class into groups." Thus, taken as a whole, Baker's opinion did not support the conclusion that Rosales was negligent for allowing the class to become too large.

Instead, Baker's real concern appeared to be Rosales's alleged failure to organize the boot camp participants in some manner that ensured sufficient space between them as they performed the farmer's carry exercise. Indeed, in a supplemental declaration submitted just before the hearing on Washington's motion, Baker reiterated his speculation that Rosales must have allowed the class to line up "in rows of 15 to 20 all walking to and back the length of the mat at the same time while carrying weights," which he concluded was "an extreme departure from the standard of care."

There was no evidence to create a triable issue of fact with respect to that assertion. The only evidence cited by Washington to support the speculation that there may have been "rows of 15 or 20" performing the farmer's carry when Washington was

19

injured came from the deposition of Derek Johnson, a class participant. Johnson testified in general terms about how the farmer's carry was performed, but said he did "not recall what happened that day." Johnson estimated that the greatest number of people he'd ever seen perform the farmer's carry at one time was "at most maybe 30 people."

Johnson described the exercise as usually *starting* with the participants "lined up on [the] back wall . . . and then you'd walk, which would be towards like the front of [the] building." But he also stated "[t]here was spacing where, you know, a group of people would line up. You know, let's say you go five yards in front, the next person would be five yards back, you know. And it'd be two columns of people." He recalled that Rosales would ask people to spread out or actually approach them and spread out, and that sometimes the participants were divided into three rows. According to Johnson, the farmer's carry was also performed in different ways on different days, with the participants sometimes stopping to perform another exercise between walking up the mat and walking back.

Washington herself provided the only direct evidence of how the farmer's carry was organized on the day she was injured. According to Washington, participants were following their "own speed and path" during the exercise, rather than proceeding in single lines across the floor. She explained that there were other participants in front of her and behind her, as well as to her left and right. Washington stated that although she was just beginning her own farmer's carry when she first saw Crowther, who was five to six feet away, Crowther was approaching her from the opposite direction—meaning Crowther was nearly finished with her exercise.

Washington's description of a class that was dispersed all over the floor during the farmer's carry—leaving at different times and going at different paces—was confirmed by Johnson, who did recall that on the day Washington was injured, he had done the farmer's carry "at least there and back" before she was injured at the beginning of her exercise. None of this evidence supports Baker's assertion that, during the class in

20

which Washington was injured, the farmer's carry exercise was performed in "rows of 15 to 20 all walking to and back the length of the mat at the same time."

The same is true when it comes to Baker's assumption that Rosales did not maintain proper spacing between the participants of the farmer's carry exercise when Washington was injured. Baker identified only one objective standard of proper spacing which he claimed Rosales was negligent for failing to meet: i.e., she "failed to provide her members with at least 3-4 ft[.] of space in any direction, since they were employing dumbbells in the exercise." There is no evidence that less than four feet of space was maintained between the members performing the farmer's carry when Washington was injured. And Washington herself claimed there was at least that amount of space between herself and those around her just before her injury.

Washington estimated that the person in front of her was about five feet away, and the person to her left was seven feet away. She did not know how far away anyone behind her might have been. Washington estimated that Crowther was 5-6 feet away to her right when she first saw her; Washington then shifted her course to give Crowther even more space by taking a step to the left. In the absence of evidence that Crowther herself had been forced to abruptly shift her course toward Washington due to a lack of space on her other side, this evidence does not raise a triable issue of fact on the issue of "gross" negligence.

No one—including Washington's expert, Baker—claims that such collisions are a common or foreseeable feature of the farmer's carry exercise. There is no evidence in our record to suggest that an accident similar to Washington's had previously occurred during a farmer's carry exercise, in any context. Indeed, the evidence is undisputed that no such incident had ever before occurred in any of Rosales's boot camp classes. Under these circumstances, there is no basis for a trier of fact to conclude Rosales's failure to organize her class in a way that protected her members against such an unlikely occurrence suggested "either a ""want of even scant care"" or ""an extreme

21

departure from the ordinary standard of conduct.'"'" (*Santa Barbara, supra*, 41 Cal.4th at p. 754.)

For all of these reasons, we conclude Washington failed to raise a triable issue of fact on her claim that Rosales's gross negligence was a cause of her injury.

## DISPOSITON

The judgment is affirmed.  Rosales is to recover her costs on appeal.


GOETHALS, J.

WE CONCUR:


FYBEL, ACTING P. J.


IKOLA, J.