Filed 1/22/24; Certified for Publication 2/13/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TY WHITEHEAD,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>        Defendant and Respondent. | A164483<br><br>(Alameda County<br>Super. Ct. No. RG18896233) |

Plaintiff Ty Whitehead sued defendant City of Oakland for injuries he suffered after his bicycle hit a pothole during a training ride for the AIDS LifeCycle fundraiser. Prior to the training ride, plaintiff signed an agreement releasing the "owners/lessors of the course or facilities used in the Event" from future liability. The trial court granted defendant's motion for summary judgment, concluding the release was enforceable. Plaintiff appeals, arguing the release was invalid because it concerned a matter of public interest. Plaintiff also contends the court erred by failing to address whether there was a triable issue of fact as to defendant's gross negligence. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In March 2017, plaintiff participated in a group training ride for AIDS LifeCycle, a multi-day group bicycle ride fundraiser from San Francisco to

1

Los Angeles.  As plaintiff was injured during that ride, we describe the nature of the AIDS LifeCycle training rides for context.

The AIDS LifeCycle fundraiser advertises a training system to help its participants build up and prepare for the long-distance ride to Los Angeles. The training system features training ride leaders who select cycling routes with specific start times and rest stops; these routes are posted on the AIDS LifeCycle website, and participants reserve spots for their selected rides.  The training system is designed to ensure there are enough certified training ride leaders to support the number of riders, and the leaders are responsible for informing riders of the organization's code of conduct and safety rules before every ride.  On longer training rides, a "support and gear" person follows the riders by car to offer support.  Training ride leaders are tasked with ensuring participants sign waivers in order to participate in training rides.

Training ride leaders must be "certified," which involves a combination of in-person classroom instruction by AIDS LifeCycle staff and outdoor bicycling instruction.  The instruction emphasizes safety and how to coach riders on safety rules and practices.  Training ride leaders must re-certify every two years; re-certification requires additional classroom instruction and participation in a minimum of about ten training rides to remain in "good standing."

The route for the training ride at issue in this case was 50 miles long, which would take roughly seven to eight hours to complete.  About 41 people were on the training ride with plaintiff.  During the ride, plaintiff—an experienced cyclist and a certified training ride leader himself (though not the leader for this particular ride)—hit a pothole that was approximately one to two inches deep, 18 inches across, and 14 inches long.  Plaintiff flipped over his bicycle handle bars, hit his head on pavement, and suffered injury.

The accident occurred on Skyline Boulevard near the intersection at Grass Valley Road.

Prior to but on the same day as the training ride, plaintiff signed a document entitled "AIDS/LifeCycle Training Ride GENERAL INFORMATION AND RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK, AND INDEMNITY AGREEMENT" (hereafter "the release").  The release contained the following assumption of risk provision: "**RISKS:  ASSUMPTION OF RISK**.  I understand that the Event is potentially a hazardous activity, and that accidents during the Event could lead to serious injury, death and/or property damage, both to me and to others.  Risks associated with the Event may include, but are not limited to: [¶] using public streets and facilities where hazards such as broken pavement and road debris may exist; [¶] being struck by, or colliding with . . . road debris; [¶] . . . ; [¶] negligence or carelessness of . . . owners/lessors of the course or facility owners (which may include state and local governmental entities); [¶] negligence or carelessness in the implementation or enforcement of any rules, regulations or guidelines related to the Events and/or in the selection, use, or maintenance of any equipment, course, competition, facility or service related to the Events.  [¶] I understand that the Event may expose me to risks other than those listed above and that the risks may not be reasonably foreseeable to me, [or the organizers].  In consideration for being allowed to participate in the Event, I hereby assume all risks associated with the Event, even those risks which are not reasonably foreseeable at this time." (Bullet points and underlining omitted.)  The release expressly defined the "Event" as including training rides leading up to the seven-day ride from San Francisco to Los Angeles.

3

The release also included a waiver and release provision:  "**WAIVER AND RELEASE**.  To the maximum extent permitted by law, I hereby release, waive, forever discharge and covenant not to sue the Releasees . . . . from all liabilities, claims, costs, expenses, damages, losses and obligations, of any kind or nature . . . which may arise or result (either directly or indirectly) from my participation in the Event."  The release went on:  "For the avoidance of doubt, the Released Liabilities include all bodily injury . . . I may suffer which arises or results (either directly or indirectly) from my participation in the Event, including through any negligence of the Releasees."  As relevant here, the release defined "Releasees" as including "*the owners/lessors of the course or facilities used in the Event.*"  (Italics added.)

Additionally, the release expressly relinquished any rights under Civil Code section 1542, which at the time provided:  "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."  (Former Civ. Code, § 1542, amended by Stats. 2018, ch. 157, § 2, eff. Jan. 1, 2019.)

Plaintiff filed this suit alleging that defendant failed to maintain and repair Skyline Boulevard and that the location of the accident was in a dangerous condition due to the pothole that plaintiff hit.  Plaintiff's complaint alleged one cause of action for dangerous condition of public property (Gov. Code, § 835 et seq.) and one cause of action for public employee or contractor liability for a dangerous condition.

Defendant's first motion for summary judgment contended in part that the primary assumption of risk doctrine barred plaintiff's recovery.  The trial

4

court granted summary adjudication of the cause of action for public employee liability because plaintiff had not sued any of defendant's employees. But the court denied summary judgment, concluding defendant had not, as a matter of law, "negated the element of duty under the primary assumption of risk doctrine." The court, however, noted its ruling as to the primary assumption of risk doctrine was "without prejudice" to defendant renewing that argument in a future motion for summary judgment based on the release.[1]

Plaintiff subsequently filed a motion for summary adjudication of defendant's affirmative defenses of waiver and assumption of risk. Relying on *Tunkl v. Regents of University of Cal.* (1963) 60 Cal.2d 92 (*Tunkl*), plaintiff contended the release was void because it affected a matter of public interest, i.e., the maintenance of safe public roads. Plaintiff also argued defendant could not rely on the primary assumption of risk doctrine, because the alleged dangerous condition affected all road users, not just recreational cyclists. Defendant filed a cross-motion for summary judgment contending plaintiff's claim was barred by the release, by plaintiff's express assumption of risk, and by the primary assumption of risk doctrine.

The trial court denied plaintiff's summary adjudication motion, concluding plaintiff failed to demonstrate the release was contrary to public policy and void as a matter of law. The court noted plaintiff erroneously applied *Tunkl* to defendant's "alleged failure to maintain a safe road and repair the pothole, rather than the subject of the waiver and release, which is the organized recreational group training ride." The court also found

---

[1]     Defendant indicated it learned of plaintiff's execution of the release after filing its first summary judgment motion.

5

summary adjudication improper because plaintiff failed to address the portion of defendant's defense based on express assumption of risk.

By separate order, the trial court granted defendant's motion for summary judgment on the ground that plaintiff's execution of the release bars his claim for liability arising from a dangerous condition of public property. Having so ruled, the court expressly declined to address the parties' contentions regarding the primary assumption of risk doctrine.

After the trial court entered judgment dismissing the complaint with prejudice, plaintiff filed a notice of appeal, and defendant filed a notice of cross-appeal.

## DISCUSSION

### A. The release of liability is enforceable

Plaintiff contends the trial court erred in granting summary judgment because the release he signed affected a public interest and was therefore invalid.

To resolve whether a release is invalid, " 'we conduct not only a de novo examination of the moving and opposing papers to determine whether [defendant] is entitled to judgment as a matter of law [citation], but also conduct a de novo examination of the release document. Where, as here, no conflicting parol evidence is introduced concerning the interpretation of the document, "construction of the instrument is a question of law, and the appellate court will independently construe the writing." ' " (*YMCA of Metro. L.A. v. Superior Court* (1997) 55 Cal.App.4th 22, 26.)

Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

6

In *Tunkl*, the California Supreme Court considered whether "a release from liability for future negligence imposed as a condition for admission to a charitable hospital" was enforceable under section 1668. (*Tunkl, supra*, 60 Cal.2d at p. 94.) Finding that the subject agreement between a hospital and an entering patient affected the public interest, *Tunkl* concluded the release included within the agreement was invalid. (*Ibid.*)

In examining whether section 1668 invalidated the release, the *Tunkl* court observed that judicial interpretations of Civil Code section 1668 were consistent in holding that "the exculpatory provision [i.e., the release] may stand only if it does not involve 'the public interest.'" (*Tunkl, supra*, 60 Cal.2d at p. 96.) Noting that "[n]o definition of the concept of public interest can be contained within the four corners of a formula," the Supreme Court set forth a "rough outline of that *type of transaction* in which exculpatory provisions will be held invalid." (*Id.* at p. 98, italics added.) In the high court's words, "the attempted but invalid exemption involves a *transaction* which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision

7

whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." (*Id.* at pp. 98–101, fns. omitted, italics added.)

The *Tunkl* court explained the rationale for this rule as follows: "While *obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party*, the [circumstances in which a public interest is involved] pose a different situation. *In this situation the releasing party does not really acquiesce voluntarily* in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer. Since the service is one which each member of the public, presently or potentially, may find essential to him, *he faces, despite his economic inability to do so, the prospect of a compulsory assumption of the risk* of another's negligence." (*Tunkl, supra*, 60 Cal.2d at p. 101, italics added.)

Notably, in 2007 the Supreme Court observed that then-recent appellate decisions had "concluded categorically that private agreements made 'in the recreational sports context' releasing liability for future ordinary negligence 'do not implicate the public interest and therefore are not void as against public policy.' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 759–760 & fns. 12–17 (*City of Santa Barbara*), and cases cited; *Hass v. RhodyCo Productions* (2018) 26 Cal.App.5th 11, 29–30 (*Hass*), and cases cited.) Particularly relevant here, *Okura v. United States Cycling Fed'n* (1986) 186 Cal.App.3d 1462 (*Okura*) "establishes that bicycle racing . . . is not a matter sufficiently affected with the public interest so as to void clear and

8

unambiguous exculpatory clauses." (*Buchan v. United States Cycling Fed'n* (1991) 227 Cal.App.3d 134, 152.)

In *Okura*, the appellant was injured after hitting loose debris while participating in a bicycle race on closed portions of the public streets in the City of Hermosa Beach. (*Okura, supra*, 186 Cal.App.3d at pp. 1464–1465.) The appellant sued the city and others, alleging negligence in the preparation and maintenance of the course. (*Id.* at p. 1464.) The trial court granted summary judgment against the appellant based on a release he signed that "discharge[d] in advance the promoters, sponsors, . . . the officials, and *any involved municipalities or other public entities* (and their respective agents and employees), from and against any and all liability arising out of or connected in any way with my participation in said event, even though that liability may arise out of negligence or carelessness on the part of the persons or entities mentioned above." (*Id.* at p. 1465, italics added and omitted.)

*Okura* affirmed the grant of summary judgment, finding the release was not void as against public policy. (*Okura, supra*, 186 Cal.App.3d at pp. 1465–1466, 1469.) After assessing each of the *Tunkl* factors, the court concluded "[t]his situation does not present a transaction affecting the public interest." (*Okura,* at p. 1468.) As to the first *Tunkl* factor—whether the exemption involves a transaction that concerns a business generally considered suitable for public regulation—the court found the transaction was "entry into a public bicycle race organized by private nonprofit organizations" and "the organized racing of bicycles is not the subject of public regulation." (*Okura,* at p. 1466.) With regard to the second *Tunkl* factor—whether the party seeking exculpation is engaged in performing a service of great public importance—the court stated: "The service provided here was the organization and running of competitive bicycle races for

9

members of the organizers and the public," which "cannot be termed one that 'is often a matter of practical necessity for some members of the public.'" (*Okura*, at pp. 1466–1467.)

As to the third *Tunkl* factor—whether the service was open to the public—*Okura* indicated anyone with a bicycle and entrance fee could enter. (*Okura*, *supra*, 186 Cal.App.3d at p. 1467.) With regard to the fourth and fifth *Tunkl* factors—the essential nature of the service and the economic setting of the transaction, and whether the exculpated party has a superior bargaining power and confronts the public with a standardized adhesion contract of exculpation—the court reiterated the service provided was a leisure time activity that was not essential. (*Okura*, at p. 1468.) The court stated, "The relative bargaining strengths of the parties does not come into play absent a compelling public interest in the transaction." (*Ibid*.) As for the last *Tunkl* factor—whether the person or their property is placed under another's control—*Okura* noted there was no such release of control. (*Okura*, at p. 1468.)

This case is materially indistinguishable from *Okura*. At bottom, plaintiff executed a release in exchange for entry into a recreational cycling activity that was organized for fundraising purposes. In line with *Okura* and the other decisions cited by the Supreme Court in *City of Santa Barbara*, *supra*, 41 Cal.4th 747, we conclude the trial court properly found the release valid and enforceable because the cycling event was a nonessential sports activity that did not affect the public interest within the meaning of Civil Code section 1668.

Plaintiff argues that, for purposes of the *Tunkl* release analysis, the focus should be on defendant's provision and maintenance of public streets and highways—and not on the activity or transaction for which the release

10

was given, i.e., participation in the cycling fundraiser.  Viewed in this manner, the instant release affected the public interest in the provision and maintenance of public roads.  This reading of *Tunkl*, however, is off the mark and unconvincing.

*Tunkl* itself couched its analysis in terms of determining whether the *transaction* for which the release was given is one that affects the public interest.  (See, e.g., *Tunkl, supra*, 60 Cal.2d at p. 98, italics added ["the courts have revealed a rough outline of that *type of transaction* in which exculpatory provisions will be held invalid"]; *id.* at p. 101, italics added ["obviously no public policy opposes private, voluntary *transactions* in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party"]; *id.* at p. 102 ["The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract."].)

Likewise, in *Gavin W. v. YMCA of Metropolitan Los Angeles* (2003) 106 Cal.App.4th 662, the court held:  "Under *Tunkl* . . . determining whether a release of liability affects the public interest, and is thus void as a matter of public policy, requires analysis of *the transaction giving rise to the contract— not the allegedly negligent conduct by the party invoking the release.*"  (*Gavin W.*, at p. 670, some italics added.)  And more recently, the Supreme Court said this:  "*Tunkl's* public interest analysis focuses upon the *overall transaction—with special emphasis upon the importance of the underlying service or program, and the relative bargaining relationship of the parties*—in order to determine whether an agreement releasing future liability for ordinary negligence is unenforceable."  (*City of Santa Barbara, supra*, 41 Cal.4th at p. 762, italics added.)

11

In this case, the overall transaction was plaintiff's signing of a release of liability so that he could participate in the AIDS LifeCycle fundraiser and its organized training rides on defendant's streets. We cannot, as plaintiff urges, ignore this aspect of this case. Likewise, it cannot reasonably be concluded that a cycling fundraiser is an essential service such that plaintiff was robbed of his free will in deciding whether to sign the release. As *Okura* explained, "People are not compelled to enter the event but are merely invited to take part. If they desire to take part, they are required to sign the entry and release form. The relative bargaining strengths of the parties does not come into play absent a compelling public interest in the transaction." (*Okura*, *supra*, 186 Cal.App.3d at p. 1468; see *Hass*, *supra*, 26 Cal.App.5th at p. 31 ["half marathons are not an activity of great importance to the general public and are certainly not a matter of necessity. No racer is required to enter a particular event or to run it in any particular way."].)

Plaintiff contends "anomalous results" would result if "one who provides a service that does not involve a public interest could require a consumer to exempt from liability another who provides a service that does involve such an interest." "By parity of reasoning," plaintiff asserts, "the converse would also be true: a provider of a service that did not involve a public interest would be entitled to enforce an exemption from liability in its own contract but would be precluded from enforcing it if it was contained in the contract of a provider of a service that did involve a public interest." (Italics omitted.) To the extent plaintiff offers anomalous hypothetical situations to support his point, we are unpersuaded. We look only to the facts before us, bearing in mind that "*Tunkl's* public interest analysis focuses upon the overall transaction." (*City of Santa Barbara*, *supra*, 41 Cal.4th at p. 762.)

Plaintiff contends *Okura* is factually distinguishable because it involved a competitive race on a closed course, and both the organizers and the City of Hermosa Beach were sued for alleged negligence in the preparation and maintenance *of the course*. But plaintiff cannot escape the *Tunkl* analysis by simply focusing on defendant's allegedly negligent maintenance of a public road and altogether ignoring that he signed the release to participate in a recreational event. Indeed, he is suing defendant for its allegedly negligent maintenance of a public road that was specifically selected as part of the AIDS LifeCycle training system for group training purposes. The release here expressly covered any negligence in the maintenance of both the official course and the routes used for training purposes. As defendant points out, there is no distinction between the bicycle race in *Okura* and the organized cycling events here at issue on the critical point that all the activities were recreational in nature and did not implicate the public interest.

Contrary to plaintiff's contention, *Lewis Operating Corp. v. Superior Court* (2011) 200 Cal.App.4th 940 aligns with our application of the *Tunkl* analysis. In *Lewis Operating Corp.*, a residential apartment tenant sued his landlord after suffering injury in the onsite exercise facility. (*Lewis Operating Corp.*, at pp. 943 & fn. 1, 946.) The tenant's rental agreement included a release governing the use of the on-site exercise facility. By executing the rental agreement, the tenant agreed to the release. (*Id.* at p. 943.) The Court of Appeal concluded summary judgment should have been granted in favor of the landlord based on the plaintiff's execution of the release. (*Id.* at pp. 943–944.) While acknowledging that residential leases affect the public interest, the court reasoned that providing the amenity of an onsite exercise facility was outside the "basic, heavily regulated offering of a

13

residential dwelling" and that "providing health club or exercise facility services has repeatedly been held *not* to invoke the 'public policy' rule of *Tunkl*." (*Id.* at p. 946.) *Lewis Operating Corp.* plainly focused on the subject of the contractual release, noting as we do here that *Tunkl* itself focused on the "subject transaction" for which the release was given. (*Ibid.*)

In sum, the trial court correctly concluded the release was enforceable.[2]

## B. There was no triable issue of fact regarding gross negligence

Plaintiff argues that even if the release is enforceable, the release could not absolve defendant of liability for gross negligence, and the trial court failed to address whether the evidence raised a triable issue of fact on this topic.

Defendant acknowledges that a release cannot absolve a party from liability for gross negligence (*City of Santa Barbara*, *supra*, 41 Cal.4th at pp. 750–751), but it counters that plaintiff forfeited this claim by failing to adequately raise it below. On this score, defendant contends plaintiff presented no factual argument "explaining why or how [defendant's] conduct rises to the level of gross negligence."

" 'Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments. [Citation.] An argument or theory will . . . not be considered if it is raised for the first time on appeal. [Citation.] . . . [P]ossible theories that were not fully developed or factually presented to the trial court cannot create a 'triable issue' on appeal.' "

---

[2]     Our opinion is limited to the facts before us and should not be read as opining on the validity of a release in other contexts, e.g., where an AIDS LifeCycle participant is injured during a practice ride that is not part of the AIDS LifeCycle training program or where an injured participant suffers additional harm as a result of medical malpractice at a treating hospital.

(*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676.)

"[O]rdinary negligence 'consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm.' [Citation.] ' "[M]ere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty," ' amounts to ordinary negligence. [Citation.] However, to support a theory of ' "[g]ross negligence," ' a plaintiff must allege facts showing 'either a " ' "want of even scant care" ' " or " ' "an *extreme* departure from the ordinary standard of conduct." ' " ' " (*Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 881 (*Anderson*).) "[I]n cases involving a waiver of liability for future negligence, courts have held that conduct that substantially or unreasonably increased the inherent risk of an activity or actively concealed a known risk could amount to gross negligence, which would not be barred by a release agreement. [Citation.] Evidence of conduct that evinces an extreme departure from manufacturer's safety directions or an industry standard also could demonstrate gross negligence. [Citation.] Conversely, conduct demonstrating the failure to guard against, or warn of, a dangerous condition typically does not rise to the level of gross negligence." (*Ibid.*)

Here, plaintiff's opposition to defendant's motion for summary judgment made multiple, if somewhat brief, references to gross negligence. For example, the introduction to his opposition asserted defendant's motion should be denied because "the City increased the risk of harm to the public (which cannot be assumed under primary assumption of the risk or with a written waiver if the risk increases to the level of gross negligence, a question of fact[)]." The opposition also included assertions that defendant cannot

15

evade accountability through the release "for increasing the risk of harm that rises to gross negligence (a question of fact)," and that defendant "increased the risk of harm on Skyline in multiple ways: Installing the distracting and dangerous 'rumble strips' trap just uphill from the pothole; Misprioritizing and delaying repairs, exposing more people to more severe harm; and Poorly maintaining the road based on 'missing' data that it never even tried to obtain or provide warning to the public." Plaintiff's opposition also referenced his motion for summary adjudication, where he cited to a portion of *Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC* (2018) 25 Cal.App.5th 344 stating that "conduct that substantially or unreasonably increased the inherent risk of an activity or actively concealed a known risk could amount to gross negligence, which would not be barred by a release agreement."

Notably, however, plaintiff's opposition contained no clear argument as to how defendant's alleged deficiencies amounted to gross negligence. As the trial court indicated when plaintiff mentioned gross negligence at the summary judgment hearing, plaintiff had "merely float[ed]" the idea that there was gross negligence, thus leaving the court to guess what exactly his gross negligence theory was. The record bears this out. Although plaintiff claimed defendant increased the risk of harm in several ways, he never explained how defendant's alleged conduct *substantially or unreasonably* increased the risk in a way that amounts to gross negligence, much less pointed to evidence of a substantial or unreasonable increase in risk.

But even assuming plaintiff adequately raised the issue such that the trial court erred in declining to address it, he fails to show grounds for reversal. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

16

Plaintiff points to evidence in the record that he claims shows "[t]he City suspected it was missing data that would help prioritize repairing or repaving bikeways yet failed to take steps to verify its data were complete or obtain additional data." Specifically, Jason Patton, a "Bicycle and Pedestrian Program Manager" with defendant's Department of Transportation, testified during a deposition about a 2007 email he wrote wherein he said he suspected " 'collisions involving pavement issues are significantly underreported.' " When asked why he had suspected this, Patton explained he has personally seen people fall off their bicycles and ride on, apparently without reporting their fall. But Patton also stated that incidents involving serious injury are most likely to have a police response and result in records that come to defendant's attention. Patton asserted it was much more important to have the data defendant did have (i.e., serious injury data) rather than data of all unreported falls like the ones he observed. When asked if he had done anything to increase the accuracy of "collision data" on Oakland bikeways, Patton stated, "We are not well positioned to improve the accuracy of the data in that the police department creates it and the California Highway Patrol processes it. We're not able to change that data, nor should we be changing it." When asked if he had done anything to capture more data, such as by asking local bicycle groups to report all collisions, he responded he had not made any formal requests though he had encouraged people involved in bicycle crashes to report them.

Plaintiff also refers to a declaration by his expert, Shakir Shatnawi, Ph.D., a civil engineer with training and education in transportation engineering. According to Shatnawi, "a municipality that suspects it is 'missing data' that would help to prioritize repairing or repaving a bikeway like Skyline [citation] should take steps [to] verify that its data are complete

17

or obtain additional data.  At a minimum, a City employee who suspects that data are missing should report that concern to his or her supervisor so that appropriate steps can be taken to address it, like conducting inspections. Ignoring the fact that data are missing increases the risk of harm to road users (motorists, bicyclists, etc.), because it delays repairing or repaving the road.  The longer that a pavement defect exists, the more dangerous it becomes."

The evidence that a city employee suspected underreporting of data concerning falls or collisions based on his personal observations does not constitute evidence that data material to the issue of gross negligence actually existed.  Plaintiff's theory is at best speculative and does not create a triable issue as to whether defendant's conduct marked an extreme departure from the ordinary standard of conduct or whether it substantially or unreasonably increased the inherent risk of an activity or actively concealed a known risk.  (See *Anderson, supra*, 4 Cal.App.5th at p. 881.)

Plaintiff also points to portions of Shatnawi's declarations opining that the pavement in the area of plaintiff's incident was in "major structural distress and had failed"; the City knew or should have known there was a risk of potholes on such a road and a high risk such potholes would present a dangerous condition to bicyclists on Skyline; City personnel patched a pothole in the area in September 2015; and at a minimum the City should have returned to the area to inspect it regularly.  Shatnawi also asserted that " 'alligator cracking' "—which is "a series of interconnecting cracks caused by fatigue failure of the asphalt concrete surface under repeated traffic loading"—is considered " 'a major structural distress' " and that potholes generally " 'are recorded as high severity alligator cracking.' "

18

Plaintiff fails to explain how this evidence supports a triable claim of gross negligence. Shatnawi appears to say that whenever a street shows signs of alligator cracking or there is a risk of potholes forming, a city should inspect it regularly. But "conduct demonstrating the failure to guard against, or warn of, a dangerous condition typically does not rise to the level of gross negligence." (*Anderson, supra,* 4 Cal.App.5th at p. 881.) Here, Shatnawi offered no basis for a conclusion that defendant's conduct exceeded such ordinary negligence. Indeed, defendant's evidence established without contradiction that predicting the development of potholes from existing cracking cannot be done reliably, and that defendant had never received any complaint or notification of the pothole at issue.

Finally, plaintiff argues there was evidence that defendant "increased the risk of harm by misclassifying defects on Skyline." For this he cites to the portion of Kenneth Patton's declaration explaining that service requests for reports of potholes or defects in bicycle lanes are always assigned "priority 1" (the most urgent priority for repair), while potholes or other defects in bicycle routes are assigned a "priority 2"; and that priority 1 potholes are repaired within 1 to 5 days, while priority 2 repairs are made within weeks. During his deposition, Patton reviewed various service requests for potholes or defects on Skyline Boulevard dating back to 2009. He could not explain why "priority 3" (the least urgent priority for repair) was assigned to some of these service requests, which indicated potential errors in the priority assignment or perhaps initial misdescriptions of the issue.

That mistakes may have been made in prioritizing service requests does not assist plaintiff's case. The evidence of misprioritization concerned a mere handful of service requests, some of which were made many years before the incident in question. Such evidence falls far short of establishing a

19

triable issue that defendant's conduct reflected an extreme departure from the ordinary standard of conduct.  Moreover, there is no evidence that these select mistakes substantially or unreasonably increased the inherent risk of the cycling activity at issue.

In sum, the trial court correctly granted summary judgment based on the release.  In light of this conclusion, we need not and do not address the dispute between the parties as to whether the doctrine of primary assumption of risk forecloses plaintiff's claim.

## DISPOSITION

The judgment is affirmed.  Defendant is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278.)


_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Petrou, J.

*Whitehead v. City of Oakland* (A164483)

20

Filed 2/13/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TY WHITEHEAD,<br><br>     Plaintiff and Appellant,<br>v.<br>CITY OF OAKLAND,<br><br>     Defendant and Respondent. | A164483<br><br>(Alameda County<br>Super. Ct. No. RG18896233) |

BY THE COURT:[3]

The written opinion which was filed on January 22, 2024, has now been certified for publication pursuant to rule 8.1105(b) of the California Rules of Court, and it is ordered published in the official reports.

Dated: 2/13/2024          Tucher, P.J._____
                                        Presiding Justice

---

[3]      Tucher, P.J., Fujisaki, J., and Petrou, J.

21

Trial Court:      Alameda County Superior Court

Trial Judge:      Hon. Richard L. Seabolt

Counsel:      Law Office of Gerald Clausen, Gerald A. Clausen; The Veen Firm P.C., Anthony L. Label and Steven A. Kronenberg, for Plaintiff and Appellant

Barbara J. Parker, Oakland City Attorney, Maria Bee, Chief Assistant City Attorney, Kevin P. McLaughlin, Supervising Deputy City Attorney and Allison L. Ehlert, Deputy City Attorney, for Defendant and Respondent

*Whitehead v. City of Oakland* (A164483)